# ABEL, alias MARK, alias COLLINS, alias GOLDFUS, v. UNITED STATES.

No. 2.   Argued February 24–25, 1959.—Restored to the calendar for reargument March 23, 1959.—Reargued November 9, 1959.— Decided March 28, 1960.

*James B. Donovan* argued and reargued the cause for petitioner. With him on the briefs was *Thomas M. Debevoise II*.

*Solicitor General Rankin* argued and reargued the cause for the United States. With him on the original brief were *Acting Assistant Attorney General Yeagley, William F. Tompkins* and *Kevin T. Maroney*. With him on the supplemental brief on reargument were *Assistant Attorney General Yeagley, John F. Davis, William F. Tompkins* and *Kevin T. Maroney*.

MR. JUSTICE FRANKFURTER delivered the opinion of the Court.

The question in this case is whether seven items were properly admitted into evidence at the petitioner's trial for conspiracy to commit espionage. All seven items were seized by officers of the Government without a search warrant. The seizures did not occur in connection with the exertion of the criminal process against petitioner. They arose out of his administrative arrest by the United States Immigration and Naturalization Service as a preliminary to his deportation. A motion to suppress these items as evidence, duly made in the District Court, was denied after a full hearing. 155 F. Supp. 8. Petitioner was tried, convicted and sentenced to thirty years' imprisonment and to the payment of a fine of $3,000. The Court of Appeals affirmed, 258 F. 2d 485. We granted certiorari, 358 U. S. 813, limiting the grant to the following two questions:

"1. Whether the Fourth and Fifth Amendments to the Constitution of the United States are violated by

a search and the seizure of evidence without a search warrant, after an alien suspected and officially accused of espionage has been taken into custody for deportation, pursuant to an administrative Immigration Service warrant, but has not been arrested for the commission of a crime?

"2. Whether the Fourth and Fifth Amendments to the Constitution of the United States are violated when articles so seized are unrelated to the Immigration Service warrant and, together with other articles obtained from such leads, are introduced as evidence in a prosecution for espionage?"

Argument was first heard at October Term, 1958. The case having been set down for reargument at this Term, 359 U. S. 940, counsel were asked to discuss a series of additional questions, set out in the margin.*

We have considered the case on the assumption that the conviction must be reversed should we find challenged items of evidence to have been seized in violation of the Constitution and therefore improperly admitted into evidence. We find, however, that the admission of these items was free from any infirmity and we affirm the judgment. (Of course the nature of the case, the fact that it was a prosecution for espionage, has no bearing

---

* "1. Whether under the laws and Constitution of the United States (a) the administrative warrant of the New York Acting District Director of the Immigration and Naturalization Service was validly issued, (b) such administrative warrant constituted a valid basis for arresting petitioner or taking him into custody, and (c) such warrant furnished a valid basis for the searches and seizures affecting his person, luggage, and the room occupied by him at the Hotel Latham.

"2. Whether, independently of such administrative warrant, petitioner's arrest, and the searches and seizures affecting his person, luggage, and the room occupied by him at the Hotel Latham, were valid under the laws and Constitution of the United States.

"3. Whether on the record before us the issues involved in Questions '1 (a),' '1 (b),' and '2' are properly before the Court."

whatever upon the legal considerations relevant to the admissibility of evidence.)

The seven items, all in petitioner's possession at the time of his administrative arrest, the admissibility of which is in question, were the following:

(1) a piece of graph paper, carrying groups of numbers arranged in rows, allegedly a coded message;

(2) a forged birth certificate, certifying the birth of "Martin Collins" in New York County in 1897;

(3) a birth certificate, certifying the birth of "Emil Goldfus" in New York in 1902 (Emil Goldfus died in 1903);

(4) an international certificate of vaccination, issued in New York to "Martin Collins" in 1957;

(5) a bank book of the East River Savings Bank containing the account of "Emil Goldfus";

(6) a hollowed-out pencil containing 18 microfilms; and

(7) a block of wood, wrapped in sandpaper, and containing within it a small booklet with a series of numbers on each page, a so-called "cipher pad."

Items (2), (3), (4) and (5) were relevant to the issues of the indictment for which petitioner was on trial in that they corroborated petitioner's use of false identities. Items (1), (6) and (7) were incriminatory as useful means for one engaged in espionage.

The main claims which petitioner pressed upon the Court may be thus summarized: (1) the administrative arrest was used by the Government in bad faith; (2) administrative arrests as preliminaries to deportation are unconstitutional; and (3) regardless of the validity of the administrative arrest here, the searches and seizures through which the challenged items came into the Government's possession were not lawful ancillaries to such an arrest. These claims cannot be judged apart from the circumstances leading up to the arrest and the nature of

the searches and seizures. It becomes necessary to relate these matters in considerable detail.

Petitioner was arrested by officers of the Immigration and Naturalization Service (hereafter abbreviated as I. N. S.) on June 21, 1957, in a single room in the Hotel Latham in New York City, his then abode. The attention of the I. N. S. had first been drawn to petitioner several days earlier when Noto, a Deputy Assistant Commissioner of the I. N. S., was told by a liaison officer of the Federal Bureau of Investigation (hereafter abbreviated as F. B. I.) that petitioner was believed by the F. B. I. to be an alien residing illegally in the United States. Noto was told of the F. B. I.'s interest in petitioner in connection with espionage.

An uncontested affidavit before the District Court asserted the following with regard to the events leading up to the F. B. I.'s communication with Noto about petitioner. About one month before the F. B. I. communicated with Noto, petitioner had been mentioned by Hayhanen, a recently defected Russian spy, as one with whom Hayhanen had for several years cooperated in attempting to commit espionage. The F. B. I. had thereupon placed petitioner under investigation. At the time the F. B. I. communicated with the I. N. S. regarding petitioner, the case against him rested chiefly upon Hayhanen's story, and Hayhanen, although he was later to be the Government's principal witness at the trial, at that time insisted that he would refuse to testify should petitioner be brought to trial, although he would fully cooperate with the Government in secret. The Department of Justice concluded that without Hayhanen's testimony the evidence was insufficient to justify petitioner's arrest and indictment on espionage charges. The decision was thereupon made to bring petitioner to the attention of the I. N. S., with a view to commencing deportation proceedings against him.

Upon being notified of the F. B. I.'s belief that petitioner was residing illegally in this country, Noto asked the F. B. I. to supply the I. N. S. with further information regarding petitioner's status as an alien. The F. B. I. did this within a week. The I. N. S. concluded that if petitioner were, as suspected, an alien, he would be subject to deportation in that he had failed to comply with the legal duty of aliens to notify the Attorney General every January of their address in the United States. 8 U. S. C. § 1305. Noto then determined on petitioner's administrative arrest as a preliminary to his deportation. The F. B. I. was so informed. On June 20, two I. N. S. officers, Schoenenberger and Kanzler, were dispatched by Noto to New York to supervise the arrest. These officers carried with them a warrant for petitioner's arrest and an order addressed to petitioner directing him to show cause why he should not be deported. They met in New York with the District Director of the I. N. S. who, after the information in the possession of the I. N. S. regarding petitioner was put before him, signed the warrant and the order. Following this, Schoenenberger and Kanzler went to F. B. I. headquarters in New York where, by prearrangement with the F. B. I. in Washington, they were met by several F. B. I. officers. These agreed to conduct agents of the I. N. S. to petitioner's hotel so that the I. N. S. might accomplish his arrest. The F. B. I. officer in charge asked whether, before the petitioner was arrested, the F. B. I. might "interview" him in an attempt to persuade him to "cooperate" with regard to his espionage. To this Schoenenberger agreed.

At 7 o'clock the next morning, June 21, two officers of the I. N. S. and several F. B. I. men gathered in the corridor outside petitioner's room at the Hotel Latham. All but two F. B. I. agents, Gamber and Blasco, went into the room next to petitioner's, which the F. B. I. had occupied in the course of its investigation of petitioner.

Gamber and Blasco were charged with confronting petitioner and soliciting his cooperation with the F. B. I. They had no warrant either to arrest or to search. If petitioner proved cooperative their instructions were to telephone to their superior for further instructions. If petitioner failed to cooperate they were to summon the waiting I. N. S. agents to execute their warrant for his arrest.

Gamber rapped on petitioner's door. When petitioner released the catch, Gamber pushed open the door and walked into the room, followed by Blasco. The door was left ajar and a third F. B. I. agent came into the room a few minutes later. Petitioner, who was nude, was told to put on a pair of undershorts and to sit on the bed, which he did. The F. B. I. agents remained in the room questioning petitioner for about twenty minutes. Although petitioner answered some of their questions, he did not "cooperate" regarding his alleged espionage. A signal was thereupon given to the two agents of the I. N. S. waiting in the next room. These came, into petitioner's room and served petitioner with the warrant for his arrest and with the order to show cause. Shortly thereafter Schoenenberger and Kanzler, who had been waiting outside the hotel, also entered petitioner's room. These four agents of the I. N. S. remained with petitioner in his room for about an hour. For part of this time an F. B. I. agent was also in the room and during all of it another F. B. I. agent stood outside the open door of the room, where he could observe the interior.

After placing petitioner under arrest, the four I. N. S. agents undertook a search of his person and of all of his belongings in the room, and the adjoining bathroom, which lasted for from fifteen to twenty minutes. Petitioner did not give consent to this search; his consent was not sought. The F. B. I. agents observed this search but took no part in it. It was Schoenenberger's testimony to

the District Court that the purpose of this search was to discover weapons and documentary evidence of petitioner's "alienage"—that is, documents to substantiate the information regarding petitioner's status as an alien which the I. N. S. had received from the F. B. I. During this search one of the challenged items of evidence, the one we have designated (2), a birth certificate for "Martin Collins," was seized. Weapons were not found, nor was any other evidence regarding petitioner's "alienage."

When the search was completed, petitioner was told to dress himself, to assemble his things and to choose what he wished to take with him. With the help of the I. N. S. agents almost everything in the room was packed into petitioner's baggage. A few things petitioner deliberately left on a window sill, indicating that he did not want to take them, and several other things which he chose not to pack up into his luggage he put into the room's wastepaper basket. When everything had been assembled, petitioner asked and received permission to repack one of his suitcases. While petitioner was doing so, Schoenenberger noticed him slipping some papers into the sleeve of his coat. Schoenenberger seized these. One of them was the challenged item of evidence which we have designated (1), a piece of graph paper containing a coded message.

When petitioner's belongings had been completely packed, petitioner agreed to check out of the hotel. One of the F. B. I. agents obtained his bill from the hotel and petitioner paid it. Petitioner was then handcuffed and taken, along with his baggage, to a waiting automobile and thence to the headquarters of the I. N. S. in New York. At I. N. S. headquarters, the property petitioner had taken with him was searched more thoroughly than it had been in his hotel room, and three more of the challenged items were discovered and seized. These were the ones we have designated (3), (4) and (5), the "Emil

Goldfus" birth certificate, the international vaccination certificate, and the bank book.

As soon as petitioner had been taken from the hotel, an F. B. I. agent, Kehoe, who had been in the room adjoining petitioner's during the arrest and search and who, like the I. N. S. agents, had no search warrant, received permission from the hotel management to search the room just vacated by petitioner. Although the bill which petitioner had paid entitled him to occupy the room until 3 p. m. of that day, the hotel's practice was to consider a room vacated whenever a guest removed his baggage and turned in his key. Kehoe conducted a search of petitioner's room which lasted for about three hours. Among other things, he seized the contents of the wastepaper basket into which petitioner had put some things while packing his belongings. Two of the items thus seized were the challenged items of evidence we have designated (6) and (7): a hollow pencil containing microfilm and a block of wood containing a "cipher pad."

Later in the day of his arrest, petitioner was taken by airplane to a detention center for aliens in Texas. He remained there for several weeks until arrested upon the charge of conspiracy to commit espionage for which he was brought to trial and convicted in the Eastern District of New York.

I.

The underlying basis of petitioner's attack upon the admissibility of the challenged items of evidence concerns the motive of the Government in its use of the administrative arrest. We are asked to find that the Government resorted to a subterfuge, that the Immigration and Naturalization Service warrant here was a pretense and sham, was not what it purported to be. According to petitioner, it was not the Government's true purpose in arresting him under this warrant to take him into custody pending

a determination of his deportability. The Government's real aims, the argument runs, were (1) to place petitioner in custody so that pressure might be brought to bear upon him to confess his espionage and cooperate with the F. B. I., and (2) to permit the Government to search through his belongings for evidence of his espionage to be used in a designed criminal prosecution against him. The claim is, in short, that the Government used this administrative warrant for entirely illegitimate purposes and that articles seized as a consequence of its use ought to have been suppressed.

Were this claim justified by the record, it would indeed reveal a serious misconduct by law-enforcing officers. The deliberate use by the Government of an administrative warrant for the purpose of gathering evidence in a criminal case must meet stern resistance by the courts. The preliminary stages of a criminal prosecution must be pursued in strict obedience to the safeguards and restrictions of the Constitution and laws of the United States. A finding of bad faith is, however, not open to us on this record. What the motive was of the I. N. S. officials who determined to arrest petitioner, and whether the I. N. S. in doing so was not exercising its powers in the lawful discharge of its own responsibilities but was serving as a tool for the F. B. I. in building a criminal prosecution against petitioner, were issues fully canvassed in both courts below. The crucial facts were found against the petitioner.

On this phase of the case the district judge, having permitted full scope to the elucidation of petitioner's claim, having seen and heard witnesses, in addition to testimony by way of affidavits, and after extensive argument, made these findings:

"[T]he evidence is persuasive that the action taken by the officials of the Immigration and Naturalization Service is found to have been in entire good faith.

The testimony of Schoenenberger and Noto leaves no doubt that while the first information that came to them concerning the [petitioner] . . . was furnished by the F. B. I.—which cannot be an unusual happening—the proceedings taken by the Department differed in no respect from what would have been done in the case of an individual concerning whom no such information was known to exist.

"The defendant argues that the testimony establishes that the arrest was made under the direction and supervision of the F. B. I., but the evidence is to the contrary, and it is so found.

"No good reason has been suggested why these two branches of the Department of Justice should not cooperate, and that is the extent of the showing made on the part of the defendant." 155 F. Supp. 8, 11.

The opinion of the Court of Appeals, after careful consideration of the matter, held that the answer "must clearly be in the affirmative" to the question "whether the evidence in the record supports the finding of good faith made by the court below." 258 F. 2d 485, 494.

Among the statements in evidence relied upon by the lower courts in making these findings was testimony by Noto that the interest of the I. N. S. in petitioner was confined to petitioner's illegal status in the United States; that in informing the I. N. S. about petitioner's presence in the United States the F. B. I. did not indicate what action it wanted the I. N. S. to take; that Noto himself made the decision to arrest petitioner and to commence deportation proceedings against him; that the F. B. I. made no request of him to search for evidence of espionage at the time of the arrest; and that it was "usual and mandatory" for the F. B. I. and I. N. S. to work together in the manner they did. There was also the testimony of Schoenenberger, regarding the purpose of the search he

made of petitioner's belongings, that the motive was to look for weapons and documentary evidence of alienage. To be sure, the record is not barren of evidence supporting an inference opposed to the conclusion to which the two lower courts were led by the record as a whole: for example, the facts that the I. N. S. held off its arrest of petitioner while the F. B. I. solicited his cooperation, and that the F. B. I. held itself ready to search petitioner's room as soon as it was vacated. These elements, however, did not, and were not required to, persuade the two courts below in the face of ample evidence of good faith to the contrary, especially the human evidence of those involved in the episode. We are not free to overturn the conclusion of the courts below when justified by such solid proof.

Petitioner's basic contention comes down to this: even without a showing of bad faith, the F. B. I. and I. N. S. must be held to have cooperated to an impermissible extent in this case, the case being one where the alien arrested by the I. N. S. for deportation was also suspected by the F. B. I. of crime. At the worst, it may be said that the circumstances of this case reveal an opportunity for abuse of the administrative arrest. But to hold illegitimate, in the absence of bad faith, the cooperation between I. N. S. and F. B. I. would be to ignore the scope of rightful cooperation between two branches of a single Department of Justice concerned with enforcement of different areas of law under the common authority of the Attorney General.

The facts are that the F. B. I. suspected petitioner both of espionage and illegal residence in the United States as an alien. That agency surely acted not only with propriety but in discharge of its duty in bringing petitioner's illegal status to the attention of the I. N. S., particularly after it found itself unable to proceed with petitioner's prosecution for espionage. Only the I. N. S. is authorized to initiate deportation proceedings, and certainly the

F. B. I. is not to be required to remain mute regarding one they have reason to believe to be a deportable alien, merely because he is also suspected of one of the gravest of crimes and the F. B. I. entertains the hope that criminal proceedings may eventually be brought against him. The I. N. S., just as certainly, would not have performed its responsibilities had it been deterred from instituting deportation proceedings solely because it became aware of petitioner through the F. B. I., and had knowledge that the F. B. I. suspected petitioner of espionage. The Government has available two ways of dealing with a criminally suspect deportable alien. It would make no sense to say that branches of the Department of Justice may not cooperate in pursuing one course of action or the other, once it is honestly decided what course is to be preferred. For the same reasons this cooperation may properly extend to the extent and in the manner in which the F. B. I. and I. N. S. cooperated in effecting petitioner's administrative arrest. Nor does it taint the administrative arrest that the F. B. I. solicited petitioner's cooperation before it took place, stood by while it did, and searched the vacated room after the arrest. The F. B. I. was not barred from continuing its investigation in the hope that it might result in a prosecution for espionage because the I. N. S., in the discharge of its duties, had embarked upon an independent decision to initiate proceedings for deportation.

The Constitution does not require that honest law enforcement should be put to such an irrevocable choice between two recourses of the Government. For a contrast to the proper cooperation between two branches of a single Department of Justice as revealed in this case, see the story told in *Colyer* v. *Skeffington,* 265 F. 17. That case sets forth in detail the improper use of immigration authorities by the Bureau of Investigation of the Department of Justice when the immigration service was

a branch of the Department of Labor and was acting not within its lawful authority but as the cat's paw of another, unrelated branch of the Government.

We emphasize again that our view of the matter would be totally different had the evidence established, or were the courts below not justified in not finding, that the administrative warrant was here employed as an instrument of criminal law enforcement to circumvent the latter's legal restrictions, rather than as a bona fide preliminary step in a deportation proceeding. The test is whether the decision to proceed administratively toward deportation was influenced by, and was carried out for, a purpose of amassing evidence in the prosecution for crime. The record precludes such a finding by this Court.

## II.

The claim that the administrative warrant by which petitioner was arrested was invalid, because it did not satisfy the requirements for "warrants" under the Fourth Amendment, is not entitled to our consideration in the circumstances before us. It was not made below; indeed, it was expressly disavowed. Statutes authorizing administrative arrest to achieve detention pending deportation proceedings have the sanction of time. It would emphasize the disregard for the presumptive respect the Court owes to the validity of Acts of Congress, especially when confirmed by uncontested historical legitimacy, to bring into question for the first time such a long-sanctioned practice of government at the behest of a party who not only did not challenge the exercise of authority below, but expressly acknowledged its validity.

The grounds relied on in the trial court and the Court of Appeals by petitioner were solely (in addition to the insufficiency of the evidence, a contention not here for review) (1) the bad faith of the Government's use of

the administrative arrest warrant and (2) the lack of a power incidental to the execution of an administrative warrant to search and seize articles for use as evidence in a later criminal prosecution. At no time did petitioner question the legality of the administrative arrest procedure either as unauthorized or as unconstitutional. Such challenges were, to repeat, disclaimed. At the hearing on the motion to suppress, petitioner's counsel was questioned by the court regarding the theory of relief relied upon:

"The Court: They [the Government] were not at liberty to arrest him [petitioner]?

"Mr. Fraiman: No, your Honor.

"They were perfectly proper in arresting him.

"We don't contend that at all.

"As a matter of fact, we contend it was their duty to arrest this man as they did.

"I think it should show or rather, it showed admirable thinking on the part of the F. B. I. and the Immigration Service.

"We don't find any fault with that.

"Our contention is that although they were permitted to arrest this man, and in fact, had a duty to arrest this man in a manner in which they did, they did not have a right to search his premises for the material which related to espionage.

. . . . .

". . . He was charged with no criminal offense in this warrant.

"The Court: He was suspected of being illegally in the country, wasn't he?

"Mr. Fraiman: Yes, your Honor.

"The Court: He was properly arrested.

"Mr. Fraiman: He was properly arrested, we concede that, your Honor."

Counsel further made it plain that the arrest warrant whose validity he was conceding was "one of these Immigration warrants which is obtained without any background material at all." Affirmative acceptance of what is now sought to be questioned could not be plainer.

The present form of the legislation giving authority to the Attorney General or his delegate to arrest aliens pending deportation proceedings under an administrative warrant, not a judicial warrant within the scope of the Fourth Amendment, is § 242 (a) of the Immigration and Nationality Act of 1952. (8 U. S. C. § 1252 (a)). The regulations under this Act delegate the authority to issue these administrative warrants to the District Directors of the I. N. S. "[a]t the commencement of any proceeding [to deport] . . . or at any time thereafter . . . whenever, in [their] . . . discretion, it appears that the arrest of the respondent is necessary or desirable." 8 CFR § 242.2 (a). Also, according to these regulations, proceedings to deport are commenced by orders to show cause issued by the District Directors or others; and the "Operating Instructions" of the I. N. S. direct that the application for an order to show cause should be based upon a showing of a prima facie case of deportability. The warrant of arrest for petitioner was issued by the New York District Director of the I. N. S. at the same time as he signed an order to show cause. Schoenenberger testified that, before the warrant and order were issued, he and Kanzler related to the District Director what they had learned from the F. B. I. regarding petitioner's status as an alien, and the order to show cause recited that petitioner had failed to register, as aliens must. Since petitioner was a suspected spy, who had never acknowledged his residence in the United States to the Government or openly admitted his presence here, there was ample reason to believe that his arrest pending deportation was "necessary or desirable." The arrest procedure followed

in the present case fully complied with the statute and regulations.

Statutes providing for deportation have ordinarily authorized the arrest of deportable aliens by order of an executive official. The first of these was in 1798. Act of June 25, 1798, c. 58, § 2, 1 Stat. 571. And see, since that time, and before the present Act, Act of Oct. 19, 1888, c. 1210, 25 Stat. 566; Act of Mar. 3, 1903, c. 1012, § 21, 32 Stat. 1218; Act of Feb. 20, 1907, c. 1134, § 20, 34 Stat. 904; Act of Feb. 5, 1917, c. 29, § 19, 39 Stat. 889; Act of Oct. 16, 1918, c. 186, § 2, 40 Stat. 1012; Act of May 10, 1920, c. 174, 41 Stat. 593; Internal Security Act of 1950, c. 1024, Title I, § 22, 64 Stat. 1008. To be sure, some of these statutes, namely the Acts of 1888, 1903 and 1907, dealt only with aliens who had landed illegally in the United States, and not with aliens sought to be deported by reason of some act or failure to act since entering. Even apart from these, there remains over-whelming historical legislative recognition of the pro-priety of administrative arrest for deportable aliens such as petitioner.

The constitutional validity of this long-standing admin-istrative arrest procedure in deportation cases has never been directly challenged in reported litigation. Two lower court cases involved oblique challenges, which were sum-marily rejected. *Podolski* v. *Baird,* 94 F. Supp. 294; *Ex parte Avakian,* 188 F. 688, 692. See also the discussion in *Colyer* v. *Skeffington,* 265 F. 17, reversed on other grounds *sub nom. Skeffington* v. *Katzeff,* 277 F. 129, where the Dis-trict Court made an exhaustive examination of the fair-ness of a group of deportation proceedings initiated by administrative arrests, but nowhere brought into question the validity of the administrative arrest procedure as such. This Court seems never expressly to have directed its attention to the particular question of the constitutional validity of administrative deportation warrants. It has

frequently, however, upheld administrative deportation proceedings shown by the Court's opinion to have been begun by arrests pursuant to such warrants. See *The Japanese Immigrant Case,* 189 U. S. 86; *Zakonaite* v. *Wolf,* 226 U. S. 272; *Bilokumsky* v. *Tod,* 263 U. S. 149; *Carlson* v. *Landon,* 342 U. S. 524. In *Carlson* v. *Landon,* the validity of the arrest was necessarily implicated, for the Court there sustained discretion in the Attorney General to deny bail to alien Communists held pending deportation on administrative arrest warrants. In the presence of this impressive historical evidence of acceptance of the validity of statutes providing for administrative deportation arrest from almost the beginning of the Nation, petitioner's disavowal of the issue below calls for no further consideration.

## III.

Since petitioner's arrest was valid, we reach the question whether the seven challenged items, all seized during searches which were a direct consequence of that arrest, were properly admitted into evidence. This issue raises three questions: (1) Were the searches which produced these items proper searches for the Government to have made? If they were not, then whatever the nature of the seized articles, and however proper it would have been to seize them during a valid search, they should have been suppressed as the fruits of activity in violation of the Fourth Amendment. *E. g., Weeks* v. *United States,* 232 U. S. 383, 393. (2) Were the articles seized properly subject to seizure, even during a lawful search? We have held in this regard that not every item may be seized which is properly inspectible by the Government in the course of a legal search; for example, private papers desired by the Government merely for use as evidence may not be seized, no matter how lawful the search which

discovers them, *Gouled* v. *United States,* 255 U. S. 298, 310, nor may the Government seize, wholesale, the contents of a house it might have searched, *Kremen* v. *United States,* 353 U. S. 346. (3) Was the Government free to use the articles, even if properly seized, as evidence in a criminal case, the seizures having been made in the course of a separate administrative proceeding?

The most fundamental of the issues involved concerns the legality of the search and seizures made in petitioner's room in the Hotel Latham. The ground of objection is that a search may not be conducted as an incident to a lawful administrative arrest.

We take as a starting point the cases in this Court dealing with the extent of the search which may properly be made without a warrant following a lawful arrest for crime. The several cases on this subject in this Court cannot be satisfactorily reconciled. This problem has, as is well-known, provoked strong and fluctuating differences of view on the Court. This is not the occasion to attempt to reconcile all the decisions, or to re-examine them. Compare *Marron* v. *United States,* 275 U. S. 192, with *Go-Bart Co.* v. *United States,* 282 U. S. 344, and *United States* v. *Lefkowitz,* 285 U. S. 452; compare *Go-Bart, supra,* and *Lefkowitz, supra,* with *Harris* v. *United States,* 331 U. S. 145, and *United States* v. *Rabinowitz,* 339 U. S. 56; compare also *Harris, supra,* with *Trupiano* v. *United States,* 334 U. S. 699, and *Trupiano* with *Rabinowitz, supra* (overruling *Trupiano*). Of these cases, *Harris* and *Rabinowitz* set by far the most permissive limits upon searches incidental to lawful arrests. In view of their judicial context, the trial judge and the Government justifiably relied upon these cases for guidance at the trial; and the petitioner himself accepted the *Harris* case on the motion to suppress, nor does he ask this Court to reconsider *Harris* and *Rabinowitz.* It would, under these circumstances, be unjustifiable retro-

spective lawmaking for the Court in this case to reject the authority of these decisions.

Are there to be permitted incidental to valid administrative arrests, searches as broad in physical area as, and analogous in purpose to, those permitted by the applicable precedents as incidents to lawful arrests for crime? Specifically, were the officers of the I. N. S. acting lawfully in this case when, after his arrest, they searched through petitioner's belongings in his hotel room looking for weapons and documents to evidence his "alienage"? There can be no doubt that a search for weapons has as much justification here as it has in the case of an arrest for crime, where it has been recognized as proper. *E. g., Agnello* v. *United States,* 269 U. S. 20, 30. It is no less important for government officers, acting under established procedure to effect a deportation arrest rather than one for crime, to protect themselves and to insure that their prisoner retains no means by which to accomplish an escape.

Nor is there any constitutional reason to limit the search for materials proving the deportability of an alien, when validly arrested, more severely than we limit the search for materials probative of crime when a valid criminal arrest is made. The need for the proof is as great in one case as in the other, for deportation can be accomplished only after a hearing at which deportability is established. Since a deportation arrest warrant is not a judicial warrant, a search incidental to a deportation arrest is without the authority of a judge or commissioner. But so is a search incidental to a criminal arrest made upon probable cause without a warrant, and under *Rabinowitz,* 339 U. S., at 60, such a search does not require a judicial warrant for its validity. It is to be remembered that an I. N. S. officer may not arrest and search on his own. Application for a warrant must be made to an independent responsible officer, the District Director

of the I. N. S., to whom a prima facie case of deportability must be shown. The differences between the procedural protections governing criminal and deportation arrests are not of a quality or magnitude to warrant the deduction of a constitutional difference regarding the right of incidental search. If anything, we ought to be more vigilant, not less, to protect individuals and their property from warrantless searches made for the purpose of turning up proof to convict than we are to protect them from searches for matter bearing on deportability. According to the uniform decisions of this Court deportation proceedings are not subject to the constitutional safeguards for criminal prosecutions. Searches for evidence of crime present situations demanding the greatest, not the least, restraint upon the Government's intrusion into privacy; although its protection is not limited to them, it was at these searches which the Fourth Amendment was primarily directed. We conclude, therefore, that government officers who effect a deportation arrest have a right of incidental search analogous to the search permitted criminal law-enforcement officers.

Judged by the prevailing doctrine, the search of petitioner's hotel room was justified. Its physical scope, being confined to the petitioner's room and the adjoining bathroom, was far less extensive than the search in *Harris*. The search here was less intensive than were the deliberately exhaustive quests in *Harris* and *Rabinowitz*, and its purpose not less justifiable. The only things sought here, in addition to weapons, were documents connected with petitioner's status as an alien. These may well be considered as instruments or means for accomplishing his illegal status, and thus proper objects of search under *Harris, supra,* 331 U. S., at 154.

Two of the challenged items were seized during this search of petitioner's property at his hotel room. The first was item (2), a forged New York birth certificate

for "Martin Collins," one of the false identities which petitioner assumed in this country in order to keep his presence here undetected. This item was seizable when found during a proper search, not only as a forged official document by which petitioner sought to evade his obligation to register as an alien, but also as a document which petitioner was using as an aid in the commission of espionage, for his undetected presence in this country was vital to his work as a spy. Documents used as a means to commit crime are the proper subjects of search warrants, *Gouled* v. *United States,* 255 U. S. 298, and are seizable when discovered in the course of a lawful search, *Marron* v. *United States,* 275 U. S. 192.

The other item seized in the course of the search of petitioner's hotel room was item (1), a piece of graph paper containing a coded message. This was seized by Schoenenberger as petitioner, while packing his suitcase, was seeking to hide it in his sleeve. An arresting officer is free to take hold of articles which he sees the accused deliberately trying to hide. This power derives from the dangers that a weapon will be concealed, or that relevant evidence will be destroyed. Once this piece of graph paper came into Schoenenberger's hands, it was not necessary for him to return it, as it was an instrumentality for the commission of espionage. This is so even though Schoenenberger was not only not looking for items connected with espionage but could not properly have been searching for the purpose of finding such items. When an article subject to lawful seizure properly comes into an officer's possession in the course of a lawful search it would be entirely without reason to say that he must return it because it was not one of the things it was his business to look for. See *Harris, supra,* 331 U. S., at 154–155.

Items (3), (4), and (5), a birth certificate for "Emil Goldfus" who died in 1903, a certificate of vaccination for "Martin Collins," and a bank book for "Emil Goldfus"

were seized, not in petitioner's hotel room, but in a more careful search at I. N. S. headquarters of the belongings petitioner chose to take with him when arrested. This search was a proper one. The property taken by peti-. tioner to I. N. S. headquarters was all property which, under *Harris,* was subject to search at the place of arrest. We do not think it significantly different, when the accused decides to take the property with him, for the search of it to occur instead at the first place of detention when the accused arrives there, especially as the search of property carried by an accused to the place of detention has additional justifications, similar to those which justify a search of the person of one who is arrested. It is to be noted that this is not a case, like *Kremen* v. *United States,* 353 U. S. 346, where the entire contents of the place where the arrest was made were seized. Such a mass seizure is illegal. The Government here did not seize the contents of petitioner's hotel room. Petitioner took with him only what he wished. He chose to leave some things behind in his room, which he voluntarily relinquished. And items (3), (4), and (5) were articles subject to seizure when found during a lawful search. They were all capable of being used to establish and maintain a false identity for petitioner, just as the forged "Martin Collins" birth certificate, and were seizable for the same reasons.

Items (1)–(5) having come into the Government's possession through lawful searches and seizures connected with an arrest pending deportation, was the Government free to use them as evidence in a criminal prosecution to which they related? We hold that it was. Good reason must be shown for prohibiting the Government from using relevant, otherwise admissible, evidence. There is excellent reason for disallowing its use in the case of evidence, though relevant, which is seized by the Government in violation of the Fourth Amendment to the Constitution. "If letters and private documents can thus

be seized and held and used in evidence against a citizen accused of an offense, the protection of the Fourth Amendment declaring his right to be secure against such searches and seizures is of no value, and, so far as those thus placed are concerned, might as well be stricken from the Constitution." *Weeks* v. *United States,* 232 U. S. 383, 393.

These considerations are here absent, since items (1)–(5) were seized as a consequence of wholly lawful conduct. That being so, we can see no rational basis for excluding these relevant items from trial: no wrongdoing police officer would thereby be indirectly condemned, for there were no such wrongdoers; the Fourth Amendment would not thereby be enforced, for no illegal search or seizure was made; the Court would be lending its aid to no lawless government action, for none occurred. Of course cooperation between the branch of the Department of Justice dealing with criminal law enforcement and the branch dealing with the immigration laws would be less effective if evidence lawfully seized by the one could not be used by the other. Only to the extent that it would be to the public interest to deter and prevent such cooperation, would an exclusionary rule in a case like the present be desirable. Surely no consideration of civil liberties commends discouragement of such cooperation between these two branches when undertaken in good faith. When undertaken in bad faith to avoid constitutional restraints upon criminal law enforcement the evidence must be suppressed. That is not, as we have seen, this case. Individual cases of bad faith cooperation should be dealt with by findings to that effect in the cases as they arise, not by an exclusionary rule preventing effective cooperation when undertaken in entirely good faith.

We have left to the last the admissibility of items (6) and (7), the hollowed-out pencil and the block of wood containing a "cipher pad," because their admissibility is founded upon an entirely different set of considerations.

These two items were found by an agent of the F. B. I. in the course of a search he undertook of petitioner's hotel room, immediately after petitioner had paid his bill and vacated the room. They were found in the room's wastepaper basket, where petitioner had put them while packing his belongings and preparing to leave. No pretense is made that this search by the F. B. I. was for any purpose other than to gather evidence of crime, that is, evidence of petitioner's espionage. As such, however, it was entirely lawful, although undertaken without a warrant. This is so for the reason that at the time of the search petitioner had vacated the room. The hotel then had the exclusive right to its possession, and the hotel management freely gave its consent that the search be made. Nor was it unlawful to seize the entire contents of the wastepaper basket, even though some of its contents had no connection with crime. So far as the record shows, petitioner had abandoned these articles. He had thrown them away. So far as he was concerned, they were *bona vacantia.* There can be nothing unlawful in the Government's appropriation of such abandoned property. See *Hester* v. *United States,* 265 U. S. 57, 58. The two items which were eventually introduced in evidence were assertedly means for the commission of espionage, and were themselves seizable as such. These two items having been lawfully seized by the Government in connection with an investigation of crime, we encounter no basis for discussing further their admissibility as evidence.

*Affirmed.*

MR. JUSTICE DOUGLAS, with whom MR. JUSTICE BLACK concurs, dissenting.

Cases of notorious criminals—like cases of small, miserable ones—are apt to make bad law. When guilt permeates a record, even judges sometimes relax and let the police take shortcuts not sanctioned by constitutional

procedures. That practice, in certain periods of our history and in certain courts, has lowered our standards of law administration. The harm in the given case may seem excusable. But the practices generated by the precedent have far-reaching consequences that are harmful and injurious beyond measurement. The present decision is an excellent example.

The opening wedge that broadened the power of administrative officers—as distinguished from police—to enter and search peoples' homes was *Frank* v. *Maryland,* 359 U. S. 360. That case allowed a health inspector to enter a home without a warrant, even though he had ample time to get one. The officials of the Immigration and Naturalization Service (I. N. S.) are now added to the preferred list. They are preferred because their duties, being strictly administrative, put them in a separate category from those who enforce the criminal law. They need not go to magistrates, the Court says, for warrants of arrest. Their warrants are issued within the hierarchy of the agency itself.[1] Yet, as I attempted to show in my dissent in the *Frank* case, the Fourth Amendment in origin had to do as much with ferreting out heretics and collecting taxes as with enforcement of the criminal laws. 359 U. S., at 376–379.

Moreover, the administrative officer who invades the privacy of the home may be only a front for the police who are thus saved the nuisance of getting a warrant. We need not go far to find examples. In *Maryland* v. *Pettiford,* Sup. Bench Balt. City, The Daily Record, Dec. 16, 1959, the police used the mask of a health inspector

---

[1] Section 242 (a) of the Immigration and Nationality Act of 1952, 66 Stat. 208, 8 U. S. C. § 1252 (a), provides "Pending a determination of deportability in the case of any alien . . . such alien may, upon warrant of the Attorney General, be arrested and taken into custody."

to make the *Frank* case serve as an easy way to get a search without a warrant. Happily, they were rebuked.[2] But that case shows the kind of problems the *Frank* doctrine generates. The present case is another example of the same kind, although here the police are not rebuked. The administrative official with an administrative warrant, over which no judicial official exercises any supervision and which by statute may be used only for deportation, performs a new role. The police wear his mask to do police work. That, in my view, may not be done, even though we assume that the administrative warrant

---

[2] In the *Pettiford* case it appears that a police officer assigned to the Sanitation Division gained entrance into a home without a warrant and discovered that the defendant who occupied the premises was engaged in lottery activities. He then signaled to a policeman in charge of gambling activities who was waiting outside in accordance with a prior agreement. Lottery slips were seized and over the defendant's objection were received in evidence in a criminal trial. A motion for a new trial was granted. The Supreme Bench of Baltimore City said in its opinion:

"Section 120 of Article 12 of the Baltimore City Code provides that if the Commissioner of Health has cause to suspect that a nuisance exists in any home, he may demand entry therein in the daytime and the owner or occupier is subject to a fine if entry is denied. A conviction under this Section by the Criminal Court of Baltimore City was sustained by the Supreme Court of the United States in a five to four decision. *Frank vs. Maryland* [359 U. S. 360]. . . .

.     .     .     .

"In this case, it is evident that a principal, if not the chief purpose of the entry of the police officer assigned to the sanitation division was to endeavor to secure evidence of a lottery violation for his colleague. 'The security of one's privacy against arbitrary intrusion by the police . . . is basic to a free society.' *Wolf vs. Colorado,* 338 U. S. 25, 27. An exception to that security, upheld because indispensible for the maintenance of the community health, is not to be used to cover searches without warrants inconsistent with the conceptions of human rights [embodied] in our State and Federal Constitutions."

issued by an administrative rather than a judicial officer is valid for an arrest for the purpose of deportation. We take liberties with an Act of Congress, as well as the Constitution, when we permit this to be done. The statute permits the arrest of an alien on an administrative warrant "[p]ending a determination of deportability." [3] The Court now reads the Act as if it read "Pending an investigation of criminal conduct." Such was the nature of the arrest.

With due deference to the two lower courts, I think the record plainly shows that F. B. I. agents were the moving force behind this arrest and search. For at least a month they investigated the espionage activities of petitioner. They were tipped off concerning this man and his role in May; the arrest and search were made on June 21. The F. B. I. had plenty of time to get a search warrant, as much if not more time than they had in *Johnson* v. *United States*, 333 U. S. 10, and *Kremen* v. *United States*, 353 U. S. 346, where the Court held warrantless searches illegal. But the F. B. I. did not go to a magistrate for a search warrant. They went instead to the I. N. S. and briefed the officials of that agency on what they had discovered. On the basis of this data a report was made to John Murff, Acting District Director of the I. N. S., who issued the warrant of arrest.

No effort was made by the F. B. I. to obtain a search warrant from any judicial officer, though, as I said, there was plenty of time for such an application. The administrative warrant of arrest was chosen with care and calculation as the vehicle through which the arrest and search were to be made. The F. B. I. had an agreement with the officials of I. N. S. that this warrant of arrest would not be served at least until petitioner refused to

---

[3] Note 1, *supra*.

"cooperate." The F. B. I. agents went with agents of the I. N. S. to apprehend petitioner in his hotel room. Again, it was the F. B. I. agents who were first. They were the ones who entered petitioner's room and who interrogated him to see if he would "cooperate"; and when they were unable to get him to "cooperate" by threatening him with arrest, they signaled agents of the I. N. S. who had waited outside to come in and make the arrest. The search was made both by the F. B. I. agents and by officers of the I. N. S. And when petitioner was flown 1,000 miles to a special detention camp and held for three weeks, the agents of the F. B. I. as well as I. N. S. interrogated him.[4]

Thus the F. B. I. used an administrative warrant to make an arrest for criminal investigation both in violation of § 242 (a) of the Immigration and Nationality Act [5] and in violation of the Bill of Rights.

The issue is not whether these F. B. I. agents acted in bad faith. Of course they did not. The question is how far zeal may be permitted to carry officials bent on law enforcement. As Mr. Justice Brandeis once said, "Experience should teach us to be most on our guard to protect liberty when the Government's purposes are beneficent." *Olmstead* v. *United States*, 277 U. S. 438, 479 (dissenting opinion). The facts seem to me clearly to establish that the F. B. I. agents wore the mask of I. N. S. to do what otherwise they could not have done. They did what they could do only if they had gone to a judicial officer pursuant to the requirements of the Fourth Amendment, disclosed

---

[4] Immigration officials (who often claim that their actions have an administrative finality beyond the reach of courts, see *Ludecke* v. *Watkins,* 335 U. S. 160; *Jay* v. *Boyd,* 351 U. S. 345) have no authority to detain suspects for secret interrogation. See *United States* v. *Minker,* 350 U. S. 179.

[5] Note 1, *supra.*

their evidence, and obtained the necessary warrant for the searches which they made.

If the F. B. I. agents had gone to a magistrate, any search warrant issued would by terms of the Fourth Amendment have to "particularly" describe "the place to be searched" and the "things to be seized." How much more convenient it is for the police to find a way around those specific requirements of the Fourth Amendment! What a hindrance it is to work laboriously through constitutional procedures! How much easier to go to another official in the same department! The administrative officer can give a warrant good for unlimited search. No more showing of probable cause to a magistrate! No more limitations on what may be searched and when!

In *Rea* v. *United States,* 350 U. S. 214, federal police officers, who obtained evidence in violation of federal law governing searches and seizures and so lost their case in the federal court, repaired to a state court and proposed to use it there in a state criminal prosecution. The Court held that the Federal District Court could properly enjoin the federal official from using the illegal search and seizure as basis for testifying in the state court. The federal rules governing searches and seizures, we held, are "designed as standards for federal agents" no more to be defeated by devious than by direct methods. The present case is even more palpably vulnerable. No state agency is involved. Federal police seek to do what immigration officials can do to deport a person but what our rules, statutes, and Constitution forbid the police from doing to prosecute him for a crime.

The tragedy in our approval of these short cuts is that the protection afforded by the Fourth Amendment is removed from an important segment of our life. We today forget what the Court said in *Johnson* v. *United States, supra,* at 14, that the Fourth Amendment provision

for "probable cause" requires that those inferences "be drawn by a neutral and detached magistrate" not "by the officer engaged in the often competitive enterprise of ferreting out crime." This is a protection given not only to citizens but to aliens as well, as the opinion of the Court by implication holds. The right "of the people" covered by the Fourth Amendment certainly gives security to aliens in the same degree that "person" in the Fifth and "the accused" in the Sixth Amendments also protects them. See *Wong Wing* v. *United States,* 163 U. S. 228, 242. Here the F. B. I. works exclusively through an administrative agency—the I. N. S.—to accomplish what the Fourth Amendment says can be done only by a judicial officer. A procedure designed to serve administrative ends—deportation—is cleverly adapted to serve other ends—criminal prosecution. We have had like examples of this same trend in recent times. Lifting the requirements of the Fourth Amendment for the benefit of health inspectors was accomplished by *Frank* v. *Maryland,* as I have said. Allowing the Department of Justice rather than judicial officers to determine whether aliens will be entitled to release on bail pending deportation hearings is another. See *Carlson* v. *Landon,* 342 U. S. 524.

Some things in our protective scheme of civil rights are entrusted to the judiciary. Those controls are not always congenial to the police. Yet if we are to preserve our system of checks and balances and keep the police from being all-powerful, these judicial controls should be meticulously respected. When we read them out of the Bill of Rights by allowing short cuts as we do today and as the Court did in the *Frank* and *Carlson* cases, police and administrative officials in the Executive Branch acquire powers incompatible with the Bill of Rights.

The F. B. I. agents stalked petitioner for weeks and had plenty of time to obtain judicial warrants for searching the

premises he occupied.   I would require them to adhere to the command of the Fourth Amendment and not evade it by the simple device of wearing the masks of immigration officials while in fact they are preparing a case for criminal prosecution.

MR. JUSTICE BRENNAN, with whom THE CHIEF JUSTICE, MR. JUSTICE BLACK and MR. JUSTICE DOUGLAS join, dissenting.

This is a notorious case, with a notorious defendant. Yet we must take care to enforce the Constitution without regard to the nature of the crime or the nature of the criminal.   The Fourth Amendment protects "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." This right is a basic one of all the people, without exception; and this Court ruled in *Weeks* v. *United States,* 232 U. S. 383, that the fruits of governmental violation of this guarantee could not be used in a criminal prosecution.   The Amendment's protection is thus made effective for everyone only by upholding it when invoked by the worst of men.

The opinion of the Court makes it plain that the seizure of certain of the items of petitioner taken from his room at the Hotel Latham and used in evidence against him must depend upon the existence of a broad power, without a warrant, to search the premises of one arrested, in connection with and "incidental" to his arrest.   This power is of the sort recognized by *Harris* v. *United States,* 331 U. S. 145, and later asserted even where the arresting officers, as here, had ample time and opportunity to secure a search warrant.   *United States* v. *Rabinowitz,* 339 U. S. 56, overruling *Trupiano* v. *United States,* 334 U. S. 699.   The leading early cases do not recognize any such power to make a search generally through premises attendant upon an arrest.   See *Go-Bart Importing Co.* v.

*United States,* 282 U. S. 344; *United States* v. *Lefkowitz,* 285 U. S. 452.[1]

The general question has been extensively canvassed here, in the general context of an arrest for crime, in the *Harris, Trupiano* and *Rabinowitz* cases. Whether *Harris* and *Rabinowitz* should now be followed on their own facts is a question with which the Court is not now faced. Rather the question is whether the doctrine of those cases should be extended to a new and different set of facts— facts which present a search made under circumstances much less consistent with the Fourth Amendment's prohibition against unreasonable searches than any which this Court has hitherto approved. Factual differences weigh heavily in this area: "There is no formula for the determination of reasonableness. Each case is to be decided on its own facts and circumstances." *Go-Bart Importing Co.* v. *United States, supra,* at 357. In *Harris* and *Rabinowitz,* the broad search was performed as an incident to an arrest for crime under warrants lawfully issued. 331 U. S., at 148; 339 U. S., at 58. The issuance of these warrants is by no means automatic—it is controlled by a constitutionally prescribed standard. It thus could be held that sufficient protection was given the individual without the execution of a second warrant for the search. Cf. Clark, J., dissenting in *United States* v. *Rabinowitz,* 176 F. 2d 732, 736, reversed, 339 U. S. 56. And while a search generally through premises "incident" to an arrest for crime without a warrant has been sanctioned only inferentially here,[2] even if such a search be deemed permissible under the Fourth Amendment, it would not go so far as the result here. Such an arrest may

---

[1] Earlier expressions looking the other way, *Agnello* v. *United States,* 269 U. S. 20, 30; *Marron* v. *United States,* 275 U. S. 192, 198– 199, were put in proper perspective by their author in *Go-Bart* and *Lefkowitz.* See 282 U. S., at 358; 285 U. S., at 465.

[2] See *United States* v. *Rabinowitz, supra,* at 60.

constitutionally be made only upon probable cause, the existence of which is subject to judicial examination, see *Henry* v. *United States,* 361 U. S. 98, 100; and such an arrest demands the prompt bringing of the person arrested before a judicial officer, where the existence of probable cause is to be inquired into. Fed. Rules Crim. Proc., 5 (a) and (c). This Court has been astute to fashion methods of ensuring the due observance of these safeguards. *Henry* v. *United States, supra; Mallory* v. *United States,* 354 U. S. 449; *McNabb* v. *United States,* 318 U. S. 332.

Even assuming that the power of Congress over aliens may be as great as was said in *Galvan* v. *Press,* 347 U. S. 522, and that deportation may be styled "civil," *Harisiades* v. *Shaughnessy,* 342 U. S. 580, 594, it does not follow that Congress may strip aliens of the protections of the Fourth Amendment and authorize unreasonable searches of their premises, books and papers. Even if Congress could make the exclusionary sanction of the Amendment inapplicable in deportation proceedings, the fruits of the search here were used in a prosecution whose criminal character no dialectic can conceal. Clearly the consequence of the Fourth Amendment in such a trial is that the fruits of such a search may not be given in evidence, under the rule declared in *Weeks* v. *United States, supra.* We need not, in my view, inquire as to whether the sort of "administrative" arrest made here is constitutionally valid as to permit the officers to hold petitioner's person for deportation proceedings. With the Court, this issue may be treated as not properly before us for our consideration, and the arrest may be treated for the purposes of this case as lawful in itself. But even with *Harris* and *Rabinowitz,* that does not conclude the matter as to the search. It is patent that the sort of search permitted by those cases, and necessary to sustain the seizures here, goes beyond what is reasonably related

to the mechanics of the arrest itself—ensuring the safety of the arresting officers and the security of the arrest against the prisoner's escape. Since it does, I think it plain that before it can be concluded here that the search was not an unreasonable one, there must be some inquiry into the over-all protection given the individual by the totality of the processes necessary to the arrest and the seizure. Here the arrest, while had on what is called a warrant, was made totally without the intervention of an independent magistrate; it was made on the authorization of one administrative official to another. And after the petitioner was taken into custody, there was no obligation upon the administrative officials who arrested him to take him before any independent officer, sitting under the conditions of publicity that characterize our judicial institutions, and justify what had been done.[3] Concretely, what happened instead was this: petitioner, upon his arrest, was taken to a local administrative headquarters and then flown in a special aircraft to a special detention camp over 1,000 miles away. He was incarcerated in solitary confinement there. As far as the world knew, he had vanished. He was questioned daily at the place of incarceration for over three weeks. An executive procedure as to his deportability was had, at the camp, after a few days, but there was never any independent inquiry or judicial control over the circumstances of the arrest and the seizure till over five weeks after his arrest, when, at the detention camp, he was served with a bench warrant for his arrest on criminal charges, upon an indictment.

The Fourth Amendment imposes substantive standards for searches and seizures; but with them one of the important safeguards it establishes is a procedure; and

---

[3] This procedure is statutorily based on § 242 (a) of the Immigration and Nationality Act of 1952, 66 Stat. 208, 8 U. S. C. § 1252 (a).

.

central to this procedure is an independent control over the actions of officers effecting searches of private premises. "Indeed, the informed and deliberate determinations of magistrates empowered to issue warrants as to what searches and seizures are permissible under the Constitution are to be preferred over the hurried action of officers and others who may happen to make arrests." *United States* v. *Lefkowitz, supra,* at 464. "Absent some grave emergency, the Fourth Amendment has interposed a magistrate between the citizen and the police." *McDonald* v. *United States,* 335 U. S. 451, 455. It is one thing to say that an adequate substitute for this sort of intervention by a magistrate can be found in the strict protections with which federal criminal procedure surrounds the making of a criminal arrest—where the action of the officers must receive an antecedent or immediately subsequent independent scrutiny. It goes much further to say that such a substitute can be found in the executive processes employed here. The question is not whether they are constitutionally adequate in their own terms—whether they are a proper means of taking into custody one not charged with crime. The question is rather whether they furnish a context in which a search generally through premises can be said to be a reasonable one under the Fourth Amendment. These arrest procedures, as exemplified here, differ as night from day from the processes of an arrest for crime. When the power to make a broad, warrantless search is added to them, we create a complete concentration of power in executive officers over the person and effects of the individual. We completely remove any independent control over the powers of executive officers to make searches. They may take any man they think to be a deportable alien into their own custody, hold him without arraignment or bond, and, having been careful to apprehend him at home, make a search generally through his premises. I cannot see

how this can be said to be consistent with the Fourth Amendment's command; it was, rather, against such a concentration of executive power over the privacy of the individual that the Fourth Amendment was raised. I do not think the *Harris* and *Rabinowitz* cases have taken us to this point.

If the search here were of the sort the Fourth Amendment contemplated, there would be no need for the elaborate, if somewhat pointless, inquiry the Court makes into the "good faith" of the arrest. Once it is established that a simple executive arrest of one as a deportable alien gives the arresting officers the power to search his premises, what precise state of mind on the part of the officers will make the arrest a "subterfuge" for the start of criminal proceedings, and render the search unreasonable? We are not, I fear, given any workable answer, and of course the practical problems relative to the trial of such a matter hardly need elaboration; but the Court verbalizes the issue as "whether the decision to proceed administratively toward deportation was influenced by, and was carried out for, a purpose of amassing evidence in the prosecution for crime." But under today's ruling, every administrative arrest offers this possibility of a facile search, theoretically for things connected with unlawful presence in the country, that may turn up evidence of crime; and this possibility will be well known to arresting officers. Perhaps the question is how much basis the officers had to suspect the person of crime; but it would appear a strange test as to whether a search which turns up criminal evidence is unreasonable, that the search is the more justifiable the less there was antecedent probable cause to suspect the defendant of crime. If the search were made on a valid warrant, there would be no such issue even if it turned up matter relevant to another crime. See *Gouled* v. *United States,* 255 U. S. 298, 311–312. External procedural control in accord with the

basic demands of the Fourth Amendment removes the grounds for abuse; but the Court's attitude here must be based on a recognition of the great possibilities of abuse its decision leaves in the present situation. These possibilities have been recognized before, in a case posing less danger: "Arrest under a warrant for a minor or a trumped-up charge has been familiar practice in the past, is a commonplace in the police state of today, and too well-known in this country. . . . The progress is too easy from police action unscrutinized by judicial authorization to the police state." *United States* v. *Rabinowitz, supra,* at 82 (dissenting opinion). Where a species of arrest is available that is subject to no judicial control, the possibilities become more and more serious. The remedy is not to invite fruitless litigation into the purity of official motives, or the specific direction of official purposes. One may always assume that the officers are zealous to perform their duty. The remedy is rather to recognize that the power to perform a search generally throughout premises upon a purely executive arrest is so unconfined by any safeguards that it cannot be countenanced as consistent with the Fourth Amendment.

One more word. We are told that the governmental power to make a warrantless search might be greater where the object of the search is not related to crime but to some other "civil" proceeding—such as matter bearing on the issue whether a man should forcibly be sent from the country. The distinction is rather hollow here, where the proofs that turn up are in fact given in evidence in a criminal prosecution. And the distinction, again, invites a trial of the officers' purposes. But in any event, I think it perverts the Amendment to make this distinction. The Amendment states its own purpose, the protection of the privacy of the individual and of his property against the incursions of officials: the "right of the people to be secure in their persons, houses, papers, and effects." See

*Boyd* v. *United States,* 116 U. S. 616, 627. Like most of the Bill of Rights it was not designed to be a shelter for criminals, but a basic protection for everyone; to be sure, it must be upheld when asserted by criminals, in order that it may be at all effective, but it "reaches all alike, whether accused of crime or not." *Weeks* v. *United States, supra,* at 392. It is the individual's interest in privacy which the Amendment protects, and that would not appear to fluctuate with the "intent" of the invading officers. It is true that the greatest and most effective preventive against unlawful searches that has been devised is the exclusion of their fruits from criminal evidence, see *Weeks* v. *United States, supra; Boyd* v. *United States, supra;* but it is strange reasoning to infer from this that the central thrust of the guarantee is to protect against a search for such evidence. The argument that it is seems no more convincing to me now than when it was made by the Court in *Frank* v. *Maryland,* 359 U. S. 360. To be sure, the Court in *Boyd* v. *United States, supra,* and in subsequent cases [4] has commented upon the intimate relationship between the privilege against unlawful searches and seizures and that against self-incrimination. This has been said to be erroneous history; [5] if it was, it was even less than a harmless error; it was part of the process through which the Fourth Amendment, by means of the exclusionary rule, has become more than a dead letter in the federal courts. Certainly this putative relationship between the guarantees is not to be used as a

---

[4] See, *e. g., Gouled* v. *United States, supra,* at 306; *United States* v. *Lefkowitz, supra,* at 466–467. The *Weeks* case itself, though drawing great support from *Boyd,* appears to rest most heavily on the Fourth Amendment itself.

[5] The famous attack on the *Boyd* case's historical basis is, of course, to be found in 8 Wigmore, Evidence (3d ed. 1940), §§ 2184, 2264. The attack is incident to Wigmore's strictures on the exclusionary rule. *Id.,* §§ 2183–2184.

basis of a stinting construction of either—it was the *Boyd* case itself [6] which set what might have been hoped to be the spirit of later construction of these Amendments by declaring that the start of abuse can "only be obviated by adhering to the rule that constitutional provisions for the security of person and property should be liberally construed."    116 U. S., at 635.

Since evidence was introduced against petitioner which had been obtained in violation of his constitutional guarantees as embodied in the Fourth Amendment, I would reverse his conviction for a new trial on the evidence not subject to this objection.

---

[6] It is not without interest to note, too, that the *Boyd* case itself involved a search not in connection with a prosecution to impose fine or imprisonment, but simply with an action to forfeit 35 cases of plate glass said to have been imported into the country under a false customs declaration.