**UNITED STATES of America,**
**Appellee,**

v.

**Joseph Lemon BOYETTE, Bert Franklin**
**Mooring, and Temasia Bruce Hill**
**Mooring, Appellants.**

No. 8248.

United States Court of Appeals
Fourth Circuit.

Argued April 17, 1961.

Decided Jan. 6, 1962.

Certiorari Denied April 9, 1962.
See 82 S.Ct. 875.

J. Harvey Turner, Kinston, N. C., and
George Rountree, Jr., Wilmington, N. C.
(Rountree & Clark, Wilmington, N. C., on
brief) for appellants.

Julian T. Gaskill, U. S. Atty., Raleigh,
N. C. (Irvin B. Tucker, Jr., Asst. U. S.
Atty., Raleigh, N. C., on brief) for ap-
pellee.

Before SOBELOFF, Chief Judge, and
SOPER and HAYNSWORTH, Circuit
Judges.

HAYNSWORTH, Circuit Judge.

Out of sordid little cases such as this, important constitutional questions sometimes arise. The appellants, convicted of having procured the interstate transportation of a woman for purposes of prostitution, contend this is such a case. Asserting a violation of their Fourth Amendment rights when their establishment was searched at the time of their arrest, they seek to upset their conviction because of the receipt in evidence of records, seized during the search, made of their earnings by prostitutes working in the establishment. We think, however, that the search was not unreasonable, and that records of the earnings of the prostitutes were not improperly received in evidence.

Shortly after her return to her home in North Carolina, from whence she had been transported to the "truck stop" of the defendants, Mooring, in Virginia, the victim reported her experience to the police. She told of having been persuaded by Mr. and Mrs. Mooring and her lover, Boyette, all residents of North Carolina, to go to Virginia to work for the Moorings as a prostitute. The Moorings explained to her how she should arrange assignations with truck drivers who visited the Moorings' establishment, what her charges would be, the division of her earnings, and her maintenance of a record of her receipts upon guest checks of the sort commonly used in restaurants. She informed the law enforcement officials that, when working for the Moorings as a prostitute, she recorded her receipts after each transaction upon such a guest check, which, with her receipts, were kept in a drawer in the kitchen portion of the establishment.

Upon the basis of the information given by the victim, warrants for the arrest of Boyette and of the Moorings were issued. The warrants for the arrest of the Moorings were executed at their truck stop in Virginia, Mr. Mooring being arrested in the restaurant portion of the establishment and Mrs. Mooring in a room which she and her husband used as a bedroom when they were in residence there. Immediately after these arrests, FBI agents searched the premises. They looked in the cash register and in cabinets and drawers. They found and seized three guest checks of the sort that had been described by the victim, upon each of which the figures $5.00 had been repeatedly recorded, and upon two of them there was a notation of a $10.00 transaction. One of these checks was found in the kitchen drawer described by the victim as the place where she had been instructed to keep such records. The others were found in a waste paper basket in one of the three rooms in the establishment, which, apparently, were maintained for the fulfillment of the assignations arranged by the ladies of the place.

These barren rooms, furnished with little that was not requisite to their utilitarian purpose, contained in them no personal articles suggestive of use of these rooms for residential purposes. Each mattress was covered only by a spread. Upon a chair in one of the rooms, a prophylactic contraceptive was conveniently laid out, together with a lubricant, and hung in the two bathrooms in that portion of the building were five douche bottles. The victim testified that she used these rooms for her business purposes, but, when the end of her duty period arrived, she repaired with her lover, Boyette, to a motel where she slept.

The only room in the place which was apparently used for residential purposes was the one room occupied by the Moorings, and in which Mrs. Mooring was arrested. Nothing was seized in that room.

The Moorings do not question the lawfulness of their arrest, or the validity of the warrants which authorized them. They concede that the officers entered the building lawfully.[1] They claim no use of force.[2] They do not even assert

[1] Cf. Weeks v. United States, 232 U.S. 383, 34 S.Ct. 341, 58 L.Ed. 652.

[2] Cf. Go-Bart Importing Company v. United States, 282 U.S. 344, 51 S.Ct. 153, 75 L.Ed. 374.

a contemporaneous protest on their part, though, of course, under the circumstances no inference of consent can be founded upon the absence of protest. There is nothing to indicate that the arrests were intended as a basis of a search for evidence of other crime,[3] for the defendants were tried only for offenses suggested by the charges upon which they were arrested, and the record contains no suggestion that the agents were looking for anything other than records of the transportation of the women and of their earnings. There was no wanton seizure of the contents of the establishment;[4] the only things seized were the three guest checks bearing upon their face a fragment of the record of the pitiable receipts of the house. The assertion of unreasonableness is founded solely upon the fact that these pieces of paper were found in part in a kitchen drawer and in part in a waste paper basket in one of the rooms provided for the business purposes of the prostitutes.

■■ We need not here enter into the debate over the permissibility of a search without a warrant incident to a lawful arrest when not confined to the clothing of the person arrested. The Supreme Court has held that the Fourth Amendment prohibits only unreasonable searches, and that a reasonable search of the premises where a lawful arrest is made may be conducted incident to the arrest.[5] In the absence of any other aggravating circumstance, premises where the arrest occurs, if under the immediate control and in the possession of the arrested individual, are regarded as an extension of his person for purposes of a search incident to his arrest. The only difference is that the search of the pockets in the clothing of the arrested individual may be general but that of the premises, where the arrest occurs, may be neither general nor unreasonable. No one suggests that a thoroughgoing search of a man's home could be justified merely because he was arrested in his home upon a minor misdemeanor charge. Here, however, the search of this business establishment for instrumentalities of the crime was reasonably related to the arrest and there were no aggravating circumstances which carried the search beyond the bounds of reasonableness. Unreasonableness is asserted solely on the basis of the fact the area of the search extended to the kitchen drawer and the waste paper basket in the "bedroom." If, however, the search of the entire apartment in Harris[6] incident to the lawful arrest there was a reasonable one, surely the much more limited search of this small restaurant and sporting house, incident to the lawful arrest of its proprietors, was a reasonable one. Mooring's arrest arose out of his panderage. Reasonableness did not require confinement of the search to the restaurant portion of the building where the arrest occurred. The search was reasonably extended to that portion of his building where prostitution was practiced and its wages recorded.

Though the search be reasonable, every article discovered is not subject to seizure. The Supreme Court has frequently adverted to the distinction between seizures of contraband, fruits of crime and the instrumentalities for its accomplishment, weapons and similar articles on the one hand, and the seizure of purely evidentiary materials on the other.[7] Perhaps the influence of the

---

3. Cf. Abel v. United States, 362 U.S. 217, 80 S.Ct. 683, 4 L.Ed.2d 668; Lanzetta v. New Jersey, 306 U.S. 451, 59 S.Ct. 618, 83 L.Ed. 888.

4. Cf. Kremen v. United States, 353 U.S. 346, 77 S.Ct. 828, 1 L.Ed.2d 876.

5. Harris v. United States, 331 U.S. 145, 67 S.Ct. 1098, 91 L.Ed. 1399; United States v. Rabinowitz, 339 U.S. 56, 70 S.Ct. 430, 94 L.Ed. 653; Abel v. United States, 362 U.S. 217, 80 S.Ct. 683, 4 L.Ed.2d 668.

6. Harris v. United States, 331 U.S. 145, 67 S.Ct. 1098, 91 L.Ed. 1399.

7. Boyd v. United States, 116 U.S. 616, 6 S.Ct. 524, 29 L.Ed. 746; Weeks v. United States, 232 U.S. 383, 34 S.Ct. 341, 58 L.Ed. 652; Gouled v. United States, 255 U.S. 298, 41 S.Ct. 261, 65 L.Ed. 467; Carroll v. United States,

Fifth Amendment is felt here. At least, it has been thought that a diary in which its author has recited his criminal conduct, seized in an otherwise lawful search, should not be used against him, just as any other kind of involuntary confession is unusable under the Fifth Amendment.

The guest checks here were not instrumentalities for the accomplishment of the specific crime with which the Moorings were charged, the interstate transportation of a particular woman for purposes of prostitution. They were, however, instrumentalities used in the operation of the brothel, the general criminal enterprise of which the interstate transportation of women was but a part. They were relevant at the trial, particularly in the light of Mrs. Mooring's testimony,[8] that the girls in her establishment performed no other office than that of waitresses, for it is relevant and material to the interstate transportation charge to show that the establishment to which the woman was carried was in fact operated for purposes of prostitution or debauchery.[9] At the time of seizure, of course, the agents could not know whether those particular checks were those upon which the complaining victim had recorded her earnings, or whether they were records made by other prostitutes of theirs. At the trial the victim could not identify the writing upon these checks as being hers, but they were similar in all respects to the ones she had kept and had described to the agents, and they were found, in part, at the place where she said she was instructed to put them. In these circumstances, we think they were properly subject to seizure as instruments used in the operation of the bawdy house, the criminal enterprise in which the Moorings were engaged. They were instrumentalities of the crime in the same sense that the ledger and the bills for utility services were instrumentalities of the crime of operating a barroom, as was held in Marron v. United States, 275 U.S. 192, 48 S.Ct. 74. They were as closely related to the crime here as were the forged documents to Abel's alienage. Abel v. United States, 362 U.S. 217, 80 S.Ct. 683. These pieces of paper bore no incriminating declarations of the defendants. They were a portion of the records, maintained by others, upon the basis of which the defendants divided the spoils of their criminal activity. We find them subject to seizure.

The defendants made no motion prior to trial to suppress the guest checks as evidence. They made no objection at the trial to the evidence descriptive of the establishment and its furnishings, which so strongly points to use of the premises as a brothel. They did object to the receipt in evidence of the guest checks, the objection being made at the time the checks were offered in evidence.[10] The district judge did not decline to rule upon the objection because no motion had been made prior to trial, as required by Rule 41(e) of the Federal Rules of Criminal Procedure, 18 U.S.C.A. In his discretion, under that rule, he had the right to consider the objection upon its merits. Apparently he did so, overruling the objection because he found it without merit and not because he found it untimely. We, therefore, have considered the objection on its merits. Our consideration, however, brings us to the conclusion that this record discloses no violation of any right of the defendants under the Fourth Amendment.

Since the guest checks were lawfully seized and they were relevant to the in-

267 U.S. 132, 45 S.Ct. 280, 69 L.Ed. 543; Marron v. United States, 275 U.S. 192, 48 S.Ct. 74, 72 L.Ed. 231; United States v. Lefkowitz, 285 U.S. 452, 52 S.Ct. 420, 76 L.Ed. 877; Harris v. United States, 331 U.S. 145, 67 S.Ct. 1098, 91 L.Ed. 1399; United States v. Rabinowitz, 339 U.S. 56, 70 S.Ct. 430, 94 L.Ed. 653;

Abel v. United States, 362 U.S. 217, 80 S.Ct. 683, 4 L.Ed.2d 668.

8. She, alone, among the three defendants, testified.

9. Wilson v. United States, 232 U.S. 563, 34 S.Ct. 347, 58 L.Ed. 728.

10. It is not suggested that Boyette had any standing to make the objection.

quiry at the trial, there was no error in their admission into evidence.

The defendants have two other contentions, each of which is devoid of substance.

■ Objection was made to an inquiry of the defendant, Mrs. Mooring, on cross examination as to whether or not she had been convicted in absentia in Virginia for the operation of a bawdy house and had forfeited bond. When the objection was overruled, she answered saying, "I haven't had a copy or anything of it. I haven't had any word." The matter was not further pursued.

Since she had put her reputation as a witness in issue, we think this limited inquiry was not impermissible.

Finally, the defendants complain that they were not permitted affirmatively to contradict the prosecuting witness on a collateral matter.

■ On cross examination, the prosecuting witness denied that she had an argument with her husband in a store in North Carolina. The defense offered witnesses who were prepared to testify that the two had an argument in the store, though no relation was suggested between the incident in the store, if it occurred, and any substantive issue in the trial.

The defendants had no right to undertake, with affirmative testimony, to contradict a witness on purely collateral and irrelevant matter. The trial judge has a duty to confine the scope of the trial to reasonable bounds, and he properly limited inquiry into this unrelated matter to the questions directed to the prosecuting witness on cross examination.

■ Our review of the record of the trial discloses that these three defendants were fairly tried, and the evidence fully supports the verdicts of guilty. Since we find no violation of the Fourth Amendment rights of the defendants, and hence no error in the receipt in evidence of the records seized during the search of the Moorings' premises, we conclude that the judgments of conviction were properly entered.

Affirmed.

SOBELOFF, Chief Judge (dissenting).

When an important constitutional question arises in a "sordid little case," it is as necessary to decide it correctly as if the case were a big one, for the precedent laid down will be cited in later decisions. Moreover, in sanctioning search of a house, the rule prescribed may influence officers' conduct in situations affecting not only the depraved but the innocent. Because I think the court's decision widens beyond permissible limits the scope of searches incident to lawful arrest, I feel obliged to dissent.

The court's opinion begins with an acknowledgment of the correct rule of law, but fails to apply it. There is a clear distinction between merely evidentiary materials, which may not be seized, and certain limited categories of articles which may be taken. The latter group consists of the instrumentalities and fruits of crime, weapons, and contraband, the possession of which is itself illegal. These categories have been strictly defined and should not be expanded. One example of the application of this rule is found in United States v. Lefkowitz, 285 U.S. 452, 52 S.Ct. 420 (1932), where federal prohibition agents searched an office as an incident to a lawful arrest, and seized record books, memoranda, envelopes and other papers. Mr. Justice Butler for a unanimous Supreme Court held that the seizure violated the Fourth Amendment because the "papers were wanted by the officers solely for use as evidence of crime of which respondents were accused or suspected." 285 U.S. at 464, 52 S.Ct. at 423. The Court restated the rule, originally expressed in Boyd v. United States, 116 U.S. 616, 623–24, 6 S.Ct. 524 (1886), in the following language:

"The decisions of this court distinguish searches of one's house, office, papers or effects merely to get evidence to convict him of crime,

from searches such as those made to find stolen goods for return to the owner, to take property that has been forfeited to the government, to discover property concealed to avoid payment of duties for which it is liable, and from searches such as those made for the seizure of counterfeit coins, burglars' tools, gambling paraphernalia and illicit liquor in order to prevent the commission of crime." 285 U.S. at 465–466, 52 S.Ct. at 423.

Although in Harris v. United States, 331 U.S. 145, 67 S.Ct. 1098 (1947), the Court upheld a seizure of altered selective service cards on the ground that possession of them was itself a crime, the Court, speaking through Chief Justice Vinson, was at pains to repeat the rule in the following terms:

"This Court has frequently recognized the distinction between merely evidentiary materials, on the one hand, which may not be seized either under the authority of a search warrant or during the course of a search incident to arrest, and on the other hand, those objects which may validly be seized including the instrumentalities and means by which a crime is committed, the fruits of crime such as stolen property, weapons by which escape of the person arrested might be effected, and property the possession of which is a crime." 331 U.S. at 154, 67 S.Ct. at 1103.

For similar expressions of this rule, see Abel v. United States, 362 U.S. 217, 237–239, 80 S.Ct. 683 (1960); United States v. Rabinowitz, 339 U.S. 56, 64 n. 6, 70 S.Ct. 430 (1950); Gouled v. United States, 255 U.S. 298, 309, 41 S.Ct. 261 (1921).

The court here views the guest check receipts which were seized by the arresting officers, not as evidentiary materials, but as "instrumentalities of the crime," relying for this upon Marron v. United States, 275 U.S. 192, 48 S.Ct. 74 (1927). There, Mr. Justice Butler, speaking for the Court, did depart from the rule in Boyd v. United States, supra, and approved the seizure by federal prohibition agents of bills and ledger books as an incident to the arrest of the operators of a "speakeasy." If that case still represented the law, it might lend support to the court's conclusion.[1] However, the Marron decision has been subjected to devitalizing qualifications in subsequent cases. Only four years later, in Go-Bart Importing Co. v. United States, 282 U.S. 344, 51 S.Ct. 153 (1931), an opinion also from the pen of Mr. Justice Butler emphasized that the Marron decision was exceptional because in that case the seized materials were immediately visible to the federal agents and because there was no general rummaging in search for them. 282 U.S. at 358, 51 S.Ct. at 153. Accordingly, in Go-Bart the Supreme Court invalidated the search and seizure of record books and private papers. And the following year, in United States v. Lefkowitz, 285 U.S. 452, 52 S.Ct. 420 (1932), Mr. Justice Butler found additional reasons to limit Marron: the crime of possessing illegal liquor was presently being carried on at the time of the arrest in the Marron case, and the seized records were at that very moment being used in the execution of the crime. 285 U.S. at 465, 52 S.Ct. at 420. In light of these two later cases, it is apparent that Marron has been severely damaged, if not destroyed, as authority for a general rule that would treat records as instrumentalities of crime.

One can readily perceive the justification for Mr. Justice Butler's deliberate narrowing of Marron and return to Boyd and Gouled. There is a strong public

---

1. Even if the Marron decision stood alone, it does not altogether fit this case, for in Marron one feature which the Court stressed was that the conspiracy was actively in progress in the officers' presence. Whatever the force, as a matter of logic, this circumstance may possess, it is pertinent to point out that in our case the interstate journey and the purpose for which it was undertaken had definitely ended.

interest, altogether unrelated to facilitating the conviction of the arrested person, for permitting seizure of the classes of articles mentioned in the rule as stated in the Lefkowitz and Harris cases. For example, stolen property may be seized to effectuate its speedy return to the real owners. Weapons may be taken to prevent the escape of the arrested person. The purpose in seizing the instrumentality by which the crime was committed is to prevent its possible use in the commission of additional crimes. Illegally possessed property may be taken for the same reason.

None of the above reasons applies to the guest check receipts involved in the present case. It is indeed difficult to see how these papers, if the officers had not taken possession of them, could possibly be used to perpetrate further crimes. Yet this is the sole justification for seizing the instrumentalities of a crime in the face of the Fourth Amendment's prohibitions.

In addition, I am at a loss to comprehend how these receipts are "instrumentalities of the crime" as these words are normally understood. The crime with which these defendants are charged is the transportation of a woman in interstate commerce for immoral purposes. The guest checks were introduced as documentary proof of the immoral practices of this prosecutrix and other waitresses. The checks themselves played no role in the unlawful interstate transportation. Nor is there anything illegal or immoral in possessing these receipts. Being merely records of illicit activities, and not the means by which they were done, these receipts are distinctly outside the category of items the law permits to be seized.

The pieces of paper in question were desired by the officers, and in the circumstances could be desired, solely for use as evidence, and the officers had no other possible interest in them. Although made as an incident to a lawful arrest, a search and seizure that can have no other motivation, is condemned by the law. Apparently, not even a search warrant could validly issue for such a purpose. See Harris v. United States, 331 U.S. 145, 154, 67 S.Ct. 1098 (1947); Gouled v. United States, 255 U. S. 298, 309, 41 S.Ct. 261 (1921). The law makes this restriction, not out of solicitude for culprits, but to protect innocent persons against excessive searches and seizures. Understandably, the restriction becomes irksome when the direct beneficiary is an unsavory character accused of a base crime; the temptation is strong to relax the rule's enforcement. Yet, unless we are prepared to accord even to such a person the protection of the Fourth Amendment, it cannot be preserved for the more deserving.

For these reasons, I would reverse and remand for a new trial.