**UNITED STATES of America,**
**Plaintiff,**

v.

**Mortimer STERN and Jerome Willbach,**
**Defendants.**

United States District Court
S. D. New York.

Jan. 7, 1964.

188

Tompkins & Lauren, New York City, for defendant Jerome Willbach, Bernard Tompkins, New York City, of counsel.

Robert M. Morgenthau, U. S. Atty. for Southern Dist. of New York, for United States, Andrew J. Maloney, Asst. U. S. Atty., of counsel.

FREDERICK van PELT BRYAN, District Judge:

Defendant Willbach moves, pursuant to Rule 41(e) of the Federal Rules of Criminal Procedure, for the suppression as evidence and return to him of certain papers taken from his office by special agents of the Federal Bureau of Investigation at the time of his arrest on June 18, 1963.

The petitioner is a certified public accountant. A warrant dated June 17, 1963, was issued for his arrest based on a complaint dated June 13, 1963, alleging that he and Mortimer Stern, an agent of the Internal Revenue Service, had conspired to defraud the United States by falsifying and concealing the material fact that the federal income tax of one G. Gordon Meeks was uncollectible. The arrest was made in Willbach's place of business, and in conjunction with the arrest three agents of the FBI made a search of his private office, his secretary's office and the file room of his accounting firm. The FBI agents discovered and seized a number of papers, of which only the following have not already been suppressed and returned by consent:

1. Petitioner's diary for 1962.

2. Petitioner's diary for 1963.

3. Handwritten sheet with heading "Meeks, 3/27, M. Stern."

4. Rolodex card with a handwritten notation "M. Stern, WA-4-3000, X 301."

5. Empty envelope with the return address of the petitioner's accounting firm, addressed to "Mr. Gordon Meeks, Petroleum Consultants, Inc., 17 Battery Place, New York, N. Y.," which contained one of the photostats of Form 53 at the time of seizure.

6. Blank Internal Revenue Service Form 870, "Waiver of Restrictions on Assessment and Collection of Deficiency in Tax and Acceptance of Overassessment."

7. Blank Internal Revenue Service Form 1247, "Examination Record."

8. Two handwritten sheets with heading "Meeks, Cost of Living Statement."

9. Photostat of completed Internal Revenue Service Form 53, "Revenue Officer's Report of Uncollectible Taxes," (taxpayer G. Gordon Meeks) executed by M. Stern and dated December 13, 1962.

10. Photostat of that portion of completed Internal Revenue Service Form 53, "Revenue Officer's Report of Uncollectible Taxes," (taxpayer G. Gordon Meeks) appearing above the space for execution and date.

The petitioner does not attack the validity of the arrest. The Government, on the other hand, does not claim that Willbach consented either to the search

or to the seizure. Neither side has requested a hearing. The motion has been submitted to the court on affidavits only and must be decided on that basis.

The petitioner bases his motion on two contentions: (1) that the search was exploratory and for the purpose of obtaining evidence and therefore unreasonable, and (2) that the articles seized were not susceptible to seizure even during the course of a lawful search.

## I. *Legality of the Search*

The petitioner's first claim is that since sufficient time was available to obtain a search warrant between the filing of the complaint and the arrest, and since the arrest and search took place before any indictment was returned, the search was therefore exploratory and for the purpose of discovering evidence to be used before the grand jury that could not have been sufficiently specified in a search warrant. In essence he argues that the arrest was incident to the search rather than the reverse.

The mere fact that the Government had sufficient time to procure a search warrant is not determinative of the reasonableness of the search. It is but one factor to be considered in evaluating it. United States v. Rabinowitz, 339 U.S. 56, 70 S.Ct. 430, 94 L.Ed. 653 (1950); Carlo v. United States, 286 F.2d 841 (2 Cir.), cert. den., 366 U.S. 944, 81 S.Ct. 1672, 6 L.Ed.2d 855 (1961). If this factor, when added to all the other circumstances of the case, indicated that the purpose of the arrest was to justify an exploratory search for evidence rather than to apprehend the petitioner, the search would be unreasonable. United States v. Lefkowitz, 285 U.S. 452, 52 S.Ct. 420, 76 L.Ed. 877 (1932); see Go-Bart Importing Co. v. United States, 282 U.S. 344, 51 S.Ct. 153, 75 L.Ed. 374 (1931). In this case, however, the Government did not take possession of the entire contents of Willbach's office, as it did in Kremen v. United States, 353 U.S. 346, 77 S.Ct. 828, 1 L.Ed.2d 876 (1957) (per curiam). Indeed, the number of articles seized was considerably fewer than those taken in both the Go-Bart and Lefkowitz cases. There is no allegation that the Government agents lured Willbach to his office so that he could be arrested in the presence of his business records, as they did in United States v. Alberti, 120 F.Supp. 171 (S.D.N.Y. 1954). The petitioner was not compelled to open his desk and safe by threat of force as in Go-Bart. Indeed, the Government claims that the manila folder containing Items 3, 6 and 8 and one of the photostats of Form 53 were handed over at Willbach's direction by his secretary and this is not specifically denied by Willbach. In short, the facts alleged by the petitioner do not in themselves establish that the search was the reason for the arrest, cf. Abel v. United States, 362 U.S. 217, 80 S.Ct. 683, 4 L.Ed.2d 668 (1960), or that the purpose of the search was to discover evidence. The mere fact that some of the articles the Government found were merely evidentiary does not mean that the Government hoped to find were articles that were not the proper basis of a search. Under all the circumstances I find the search in this case to have been more like those in Harris, Rabinowitz and Abel than like those in Go-Bart, Lefkowitz and Kremen, and that it was reasonable.

## II. *Legality of the Seizure*

Even though the search itself was reasonable, the Government was not free to seize any item that it might happen to find during its course. The defendant contends that Items 1 through 10 are private papers of an evidentiary character and therefore not seizable. The Government, on the other hand, contends that all these items were used or intended to be used as the means of committing the offense charged and therefore properly seizable. To resolve this question a distinction must be made

"between merely evidentiary materials, on the one hand, which may not be seized either under the authority of a search warrant or during the course of a search incident to arrest, and on the other hand,

those objects which may validly be seized including the instrumentalities and means by which a crime is committed, the fruits of crime such as stolen property, weapons by which escape of the person arrested might be effected, and property the possession of which is a crime." Harris v. United States, 331 U.S. 145, 154, 67 S.Ct. 1098, 1103, 91 L.Ed. 1399 (1947).

The articles that the Government has seized from the defendant in this case are papers rather than narcotics or weapons. But "[t]here is no special sanctity in papers, as distinguished from other forms of property, to render them immune from search and seizure, if only they fall within the scope of the principles of the cases in which other property may be seized." Gouled v. United States, 255 U.S. 298, 309, 41 S.Ct. 261, 265, 65 L.Ed. 647 (1921). For example, when the crime charged is the possession of the papers seized, the papers are obviously the means of committing the crime. See United States v. Rabinowitz, supra, 339 U.S. at 64 & n. 6, 70 S.Ct. at 434, 94 L.Ed. 653; Harris v. United States, supra; United States v. Davis, 151 F.2d 140 (2 Cir.1945) (L. Hand, J.), aff'd, 328 U.S. 582, 66 S.Ct. 1256, 90 L.Ed. 1453 (1946). The crimes that may be committed by means of papers are not limited to those of possession, however. For example, false identification papers are as much the means of committing the crime of false impersonation as is a screwdriver the means of committing the crime of burglary. United States v. Lord, 184 F.Supp. 923 (S.D.N.Y.1960) (Kaufman, J.). Similarly, numbers tickets may be the means of committing the crime of engaging in the gambling business without having registered and paid the federal tax. Merritt v. United States, 249 F.2d 19 (6 Cir.1957) (per curiam). And when the offense charged is the failure to keep proper records, then business records may be seized in bulk. See United States v. Kraus, 270 F. 578 (S.D.N.Y.1921) (L. Hand, J.).

On the other hand, "private papers desired by the Government merely for use as evidence may not be seized, no matter how lawful the search which discovers them." Abel v. United States, supra, 362 U.S. at 234–235, 80 S.Ct. at 695, 4 L.Ed.2d 668. "The distinction must be drawn between papers which are a part of the outfit or equipment actually used to commit an offense * * * and those papers which are simply evidences of intent, design or even of the agreement of the defendants." Takahashi v. United States, 143 F.2d 118, 124 (9 Cir.1944).

The law as to the susceptibility to seizure of business records in cases in which neither possession nor the failure to keep proper records is the offense charged has had a chequered history in the federal courts. In Gouled v. United States, supra, a prosecution for defrauding the United States, the Supreme Court held that the Government could not seize executed [1] and unexecuted contracts between one of the defendants and strangers to the indictment and a bill for legal services rendered to one of the defendants. The Court of Appeals followed the Gouled case in United States v. Kirschenblatt, 16 F.2d 202 (2 Cir. 1926) (L. Hand, J.), a prosecution for violation of the prohibition laws. In the course of a search incident to a legal arrest and under a search warrant government agents discovered and seized a great many of the defendant's business records, including account books and customers' lists. In strong language the court held that such wholesale seizure could not be countenanced. It said (16 F.2d p. 204):

"It is seldom that one finds a document containing evidence of crime which was not at one time used in its commission; the papers important in any prosecution are ordinarily either communications passing between the actors or records nec-

---

1. In the case of the executed contract the Court was aided by the statement in the questions certified to it that the papers were "of evidential value only."

essary to keep track of the details. These are all that the prosecution requires, and all that, except in rare instances, it will ever get. They cannot be reached, except by a thorough search of all that the offender has, to allow which would be to countenance exactly what the amendment was designed to prevent. Therefore, while we agree that it is no answer to a search to say that papers have been seized, we cannot agree that the power extends beyond those which are a part of the forbidden act itself. It would be hazardous to attempt any definition; we shall not.

"The forged note, the fraudulent prospectus, the policy slip, the written contract, if that be forbidden, the seditious broadside—perhaps all these may be contraband and subject to seizure when found on the premises. But the whole of a man's correspondence, his books of account, the record of his business, in general, the sum of his documentary property —these, in our judgment, are as inviolate upon his arrest as they certainly are upon search warrant. * * * "

The law did not long remain in this posture, however. In Marron v. United States, 275 U.S. 192, 48 S.Ct. 74, 72 L.Ed. 231 (1927), the Supreme Court extended the range of business records susceptible to seizure far beyond the bounds set by Gouled. In a prosecution for the maintenance of a speakeasy contrary to the prohibition laws, the court held valid the seizure not only of the defendant's ledger book but also his gas, electric light, water and telephone bills. The ledger was said to be "part of the outfit or equipment actually used to commit the offense." The utility bills "were convenient, if not in fact necessary, for the keeping of the accounts; and, as they were so closely related to the business, it is not unreasonable to consider them as used to carry it on." 275 U.S. at 199, 48 S.Ct. at 77, 72 L.Ed. 231. And in United States v. Poller, 43 F.2d 911 (2 Cir.1930)

(L. Hand, J.), the court of appeals of this circuit duly followed the law as newly laid down by the Marron case and upheld the seizure of "all those [documents] which were prepared, sent to, or received by, * * * [the defendant] in connection with" the particular case of goods that was allegedly illegally imported into the United States by means of false documents. 43 F.2d at 913.

The Supreme Court, however, soon retreated from the position it had taken in the Marron case, although the extent of that retreat has been left unclear. In United States v. Lefkowitz, supra, the offense charged was the sale and delivery of liquor in violation of the prohibition laws; and a great mass of business records was seized from the desks, file cabinets and waste baskets of the defendant. In suppressing the evidence seized, the court characterized the search as made solely for the purpose of obtaining evidence. Although the papers and other articles seized were intended to be used to solicit orders for liquor in violation of the law, they were characterized as "in themselves unoffending." Mr. Justice Butler, writing for the court as he had done in Marron, distinguished his previous opinion on the grounds that in that case the crime was being committed in the arresting officers' presence, and the ledger and utility bills were in plain sight.

The court of appeals of this circuit has continued to allow government officers substantial leeway in the seizure of business records. In Matthews v. Correa, 135 F.2d 534 (2 Cir.1943), an account book and seven address books, some of which contained entries of receipts and expenditures of the bankrupt defendant and all of the latter of which contained the names, addresses and telephone numbers of her suppliers, were held to be the means of committing the crime of withholding documents affecting or relating to the property or affairs of the bankrupt. And in United States v. Lindenfeld, 142 F.2d 829 (2 Cir.) cert. den., 323 U.S. 761, 65 S.Ct. 89, 89 L.Ed. 609 (1944), a doctor's file cards on which he

kept records showing the patients to whom he had prescribed drugs were held to be the means of committing the crime of selling or giving away narcotics not in pursuance of a written order on a Treasury form. The cards were said to be

"more than mere evidence of the crime. They were the means through which defendant hoped to cover up his illegal acts, and thus were a vital factor in the criminal enterprise itself." 142 F.2d at 832.

Any attempt to devise a precise formula on the basis of the Supreme Court cases, as interpreted in this circuit, is not likely to be fruitful. On a closely related issue the Supreme Court itself has remarked that they "cannot be satisfactorily reconciled." Abel v. United States, supra, 362 U.S. at 235, 80 S.Ct. at 695, 4 L.Ed.2d 668. Moreover, any decision or susceptibility to seizure must turn on the particular facts concerning the specific articles seized.

■ One thing is clear, however. Not every article that plays some part in the commission of the alleged crime is a means of committing it in this sense. Although it is not necessary that the crime alleged could not have been committed but for the use of the article seized, after a consideration of all the circumstances it must appear that the article played a *significant* role in the commission of the crime alleged.

■■ The petitioner's diaries for the years 1962 and 1963 (Items 1 and 2) do not at all seem to fall within the standards delineated. In the first place, the Government has made no showing as to the contents of these diaries or as to whether they have any relationship whatsoever to the offense charged. But assuming that the diaries contain such entries as the dates of meetings by the petitioner with Stern or Meeks, or perhaps even notations of what was discussed at those meetings, I do not see how they can be considered a means of committing the crime. There is no indication that the diaries were meant to be submitted to the Government or to be used in any manner other than as a record for the petitioner's own use. They may contain evidence damaging to him, but

"it has been thought that a diary in which its author has recited his criminal conduct, seized in an otherwise lawful search, should not be used against him, just as any other kind of involuntary confession is unusable under the Fifth Amendment." United States v. Boyette, 299 F.2d 92, 95 (4 Cir.) (dictum), cert. den. 369 U.S. 844, 82 S.Ct. 875, 7 L.Ed.2d 848 (1962).

The handwritten sheet with the heading "Meeks, 3/27, M. Stern," (Item 3), which seems to contain notes on a meeting between Stern and Meeks, is in the same category as the diaries.

The Government had no more right to seize the Rolodex card with Mr. Stern's name and telephone number (Item 4) than it would have had to seize the telephone used to make any calls to him. It could not have played a significant role in the commission of the crime alleged. The difference between this card and those address books without accounting entries in Matthews v. Correa, supra, is that the crime charged in that case was the withholding of those very books. And the envelope addressed to Meeks (Item 5) which contained one of the photostats of Form 53, is also only a means of communication like the telephone and, therefore, not seizable.

Finally, among the items not susceptible to seizure as a means of committing the crime charged, there has not been a sufficient connection to the crime shown between the blank copies of Form 870 (Item 6) and Form 1247 (Item 7). Although Form 870 was found in a folder containing papers and correspondence concerning Meeks, there is nothing to indicate that the Form 1247 has anything to do with either Meeks or Stern. Moreover, these two forms do not perform a function in the pattern of Internal Revenue procedures sufficiently

proximate to the particular crime charged. Both forms are used by the auditing division of the Service, as distinguished with the collection division, which handles Form 53. Form 870 is used to record the taxpayer's acceptance of the adjustments in his income tax liability proposed by the Service. Form 1247 is used to record the action taken by revenue agents on returns taken out for audit. There does not appear to be any space on the latter form for any notation as to the collectibility of any taxes due and owing. These forms then, might be pertinent to a charge of falsely representing the extent of the taxpayer's liability but not to a charge of falsely representing the amount due to be uncollectible. I have been unable to discover a sufficient connection between them and the crime charged to justify their seizure.

■ On the other hand, the two handwritten sheets containing figures on the taxpayer's cost of living (Item 8) are claimed by the Government to have been used in the preparation of the original Form 53. This form is the very document by which a revenue agent would falsely represent to the Government that taxes were uncollectible. Although the Government has not provided any details as to the carrying out of the conspiracy charged, the photostats of the Form 53 (Items 9 and 10) submitted to me by the petitioner indicate that one of the allegedly false representations made to the Government may have been as to Meeks' cost of living. In this circumstance these working papers seem to me to be sufficiently related to the crime charged to constitute a means of its commission. I am not unmindful of suppression of similar papers in Gilbert v. United States, 291 F.2d 586 (9 Cir.1961), rev'd on other grounds, 370 U.S. 650, 82 S.Ct. 1399, 8 L.Ed.2d

750 (1962), but the ground of decision in that case seems to have been the scope of the search rather than the susceptibility of the papers to seizure in the course of a lawful search. Moreover, insofar as that decision may have been based on the latter ground, it represents a more narrow delineation of governmental authority than is followed in this circuit.

Whether or not the two photostats of Form 53 (Items 9 and 10) were susceptible to seizure poses a very difficult question. As I have already indicated, the original executed copy of this form would be the *sine qua non* of the crime charged. Items 9 and 10, however, are only photostats of Form 53. Although a photograph of the murder weapon would ordinarily not be the means of committing the crime of homicide, these items may have played *some* role in the commission of the crime alleged. But I do not have to decide whether this role was a *significant* one, since there is another justification for the seizure of these two photostats. Thus, I find only Item 8 properly seized as a means of committing the crime alleged.

Based on certain unpublished internal regulations of the Service,[2] the Government further argues that Items 6, 7, 9 and 10 are government property not available to the public, which the defendant Willbach had no right to possess.[3] The defendant, on the other hand, relies on the distinction between the relief of return and the relief of suppression, which has been embodied in Rule 41(e) of the Federal Rules of Criminal Procedure.

In Davis v. United States, 328 U.S. 582, 66 S.Ct. 1256, 90 L.Ed. 1453 (1946), the Supreme Court upheld, in an opinion not cited by the Government, a search and seizure of gasoline ration coupons without a warrant and not incident to a

2. Internal Revenue Service, Form Status Notice Nos. 415, 418 and 449; Internal Revenue Service, Internal Revenue Manual § 5623.

3. Forms 53 (Items 9 and 10) and 1247 (Item 7) are internal memoranda for the

use of revenue agents only. Form 870 (Item 6) is to be executed by the taxpayer after having been filled in by the Service. The Government's contention seems to be that Willbach was not entitled to have a *blank* copy of Form 870.

lawful arrest. Relying on certain regulations of the Office of Price Administration declaring such coupons to be government property subject to inspection and recall at all times, the Court said, "We are thus dealing not with *private* papers or documents but with *public* property in the custody of a citizen." 328 U.S. at 589, 66 S.Ct. at 1259, 90 L. Ed. 1453. The Court then went on to refer to one of the important repercussions of this distinction, the fact that "an owner of property who seeks to take it from one who is unlawfully in possession has long been recognized to have greater leeway than he would have but for his right to possession. The claim of ownership will even justify a trespass and warrant steps otherwise unlawful." 328 U.S. at 591, 66 S.Ct. at 1260, 90 L.Ed. 1453.

I do not understand the Davis case to authorize the seizure of government property in every case. Indeed, the Court itself said, "We do not suggest that officers seeking to reclaim government property may proceed lawlessly and subject to no restraints." 328 U.S. at 591, 66 S.Ct. at 1260, 90 L.Ed. 1453. But it does seem to me to follow from the reasoning of that case that if during the course of an otherwise lawful search federal officials discover government property in the hands of one not entitled to possess it, they may reclaim that property in a reasonable manner without violating any of that person's constitutional rights even in the absence of a valid search warrant describing the property. And, of course, since no constitutional rights are violated by the seizure, a motion to suppress will not lie.

I have considered the fact that Rule 41(b) would not have authorized the issuance of a search warrant for Items 6, 7, 9 and 10 except upon a showing that they were the instrumentalities of a crime or were "stolen or embezzled in violation of the laws of the United States." Former 18 U.S.C. § 612, the predecessor of Rule 41(b), was in effect at the time of the Davis decision, and the Advisory Committee's Note to Rule 41(b) states that the rule is a restatement of existing law. Therefore, I can find no intention on the part of the body promulgating the rule to change either the holding or the implications of the Davis decision. Moreover, and more important, Rule 41(b) deals with the grounds for issuance of a warrant for search *and* seizure. It does not follow that when the search itself is lawful, the rule must be strictly applied to determine what property may be seized.[4]

This latter reason for the non-applicability of Rule 41(b), at least in the strict fashion in which it is applied to searches *and* seizures, indicates the flaw in the defendant's reliance on the "hornbook law that the right to suppress and the right to return are not synonymous." There are numerous cases in which courts have held that an *unlawful* search and seizure of contraband will support a motion to suppress even though the Government need not return the property. E. g., Trupiano v. United States, 334 U.S. 699, 68 S.Ct. 1229, 92 L.Ed. 1663 (1948), overruled as to other issues, United States v. Rabinowitz, supra; United States v. Macri, 185 F.Supp. 144 (D.Conn.1960) (Smith, C. J.). But in these cases it was the search that was held unlawful and not merely the seizure. For this reason I find the defendant's "hornbook law" inapplicable here. Thus, even though Items 6 and 7 were

---

4. I am not unmindful of the Supreme Court's admonition in United States v. Lefkowitz, supra, 285 U.S. at 464, 52 S.Ct. at 423, 76 L.Ed. 877 that "the authority of officers to search one's house or place of business contemporaneously with his lawful arrest therein upon a valid warrant of arrest certainly is not greater than that conferred by a search warrant issued upon adequate proof and sufficiently describing the premises and the things sought to be obtained." Rabinowitz was decided before the Davis case, however. Moreover, Rabinowitz dealt with evidentiary material that the defendant could not have been compelled to produce. Presumably there are legal procedures available by which the Government can recover its own property regardless of its incriminating character.

not the means of committing the crime charged, and Items 9 and 10 may not have been so, they were properly seized as government property in the hands of one not entitled to possession;[5] and this motion must fail as to them, in addition to Item 8. Items 1 through 5 will be suppressed as evidence, and returned to the petitioner together with any copies made by the Government.

Settle order on notice.

5. The fact that Items 9 and 10 are photostats that may have been made by the petitioner does not affect this result. He was no more entitled to possess copies of Form 53 than the Government would be to retain copies of the items that were improperly seized.