**NOT PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 22-1922
_____

UNITED STATES OF AMERICA

v.

MARK MANIGAULT,
                    Appellant
_____

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
(D.C. No. 2-17-cr-00090-001)
District Judge: Honorable R. Barclay Surrick
_____

Submitted Under Third Circuit L.A.R. 34.1(a) on January 30, 2024

Before: KRAUSE, PORTER, and CHUNG, *Circuit Judges*.

(Filed: September 26, 2024)

_____

OPINION[*]
_____

PORTER, *Circuit Judge*.

---

[*] This disposition is not an opinion of the full Court and pursuant to I.O.P. 5.7 does not constitute binding precedent.

Mark Manigault discarded a firearm he could not lawfully possess in the wheel well of a parked car. On appeal, Manigault argues that the District Court erred by denying his motion to suppress evidence of him abandoning the weapon, by admitting evidence that he claims was not properly authenticated, and by denying his motion to compel production of an alleged search warrant. Because Manigault's arrest has no connection with the evidence he seeks to suppress, because Manigault had abandoned the evidence, because Manigault lacked a reasonable expectation of privacy in the property searched, and because his remaining arguments rely on allegations not supported by the record, we will affirm.

I

A

At around 11:00 p.m. on September 26, 2016, Philadelphia Police Officers Eugene Roher and Jeremy Olesik were on patrol in a marked police car. The two were familiar with the neighborhood and knew many residents by name. As the pair travelled along Osage Avenue, they recognized Mark Manigault and Tamir Austin seated on the stoop of a house. The four made eye contact with each other. Officers Roher and Olesik knew that neither lived in the area and that the two were in rival criminal factions "involved in narcotics sales." Supp. App. at 13. Suspicious, the officers circled the block. When the officers returned, they saw Manigault and Austin now seated on a ledge at the street corner between the Katnip Bar and a neighboring house. The officers exited their vehicle and approached the two men. Officer Olesik asked the pair if they were armed. Manigault and Austin lifted their shirts showing that they were not. Officer Olesik entered

Manigualt's and Austin's names into the police computer and determined that neither had an outstanding arrest warrant.

While Officer Olesik spoke with Manigault and Austin, Officer Roher walked along the sidewalk and inspected the tires and wheel wells of cars parked on the north side of the street. Officer Roher's search was not in vain. He discovered a revolver on the top of a tire inside a wheel well of a Mazda sedan. Officer Roher returned to the corner and signaled to his partner to detain Manigault and Austin.

After Manigault and Austin were detained in the back of their police vehicle, the officers continued their investigation. Officer Roher showed Officer Olesik the firearm he found in the wheel well of the Mazda. The officers walked toward the stoop where they first spotted Manigault and Austin. On the way, Officer Olesik observed another firearm, a Taurus 9 mm handgun, in a wheel well of a different vehicle, a Ford. The officers did not immediately recover the handguns. These two guns were found "[a]pproximately five to ten feet" from where the officers first observed Manigault and Austin. Supp. App. at 104.

The officers knew from experience that the Katnip Bar had cameras along its exterior. Officer Roher entered and asked the bartender if there was surveillance footage of the outside premises. The bartender allowed Officer Roher to review the video. It showed Manigault and Austin walking along the street, Austin placing a firearm under the wheel well of the Mazda, and the pair continuing to walk until out of frame.

After reviewing the video, the officers handcuffed Manigault and Austin and called for backup. Police detectives arrived at the scene, recovered the two firearms, and placed them into evidence.

Meanwhile, Manigault and Austin were transferred to the police department for processing. Austin was charged with illegal possession of the revolver found on the Mazda. Manigault, however, was not yet charged with possession of the Taurus. While the police decided whether to charge Manigault, he remained in custody for three days. After deciding not to charge, Manigault was released.

B

On September 29, 2016, Philadelphia Police Detective Michael Kimmel met with a homeowner whose property was on the same block where Officer Olesik and Officer Roher first observed Manigault and Austin. Detective Kimmel did not have a warrant but entered the home with the homeowner's permission. The homeowner also signed a consent to search. The homeowner had an outdoor video camera that provided a clear view of the parked vehicle where the second firearm was found. Detective Kimmel reviewed the footage from the night of Manigault and Austin's arrest. Like the Katnip Bar's camera, this camera captured Manigault and Austin walking together and Austin placing an object on the tire of the Mazda. But the homeowner's camera also captured Manigault placing an object into the wheel well of the Ford that was not his.

Detective Kimmel preserved this video evidence by downloading it onto his cellphone while he was still at the home. The video was later transferred to the police department's digital file system and another copy was downloaded to an external hard

4

drive at Detective Kimmel's desk.[1] Detective Kimmel then deleted the video file from his cellphone.

## C

Manigault was indicted by a grand jury and charged with one count of possession of a firearm by a felon under 18 U.S.C. § 922(g)(1). Manigault filed dozens of pretrial motions resulting in years of pretrial litigation. The District Court denied these motions, and Manigault was convicted.[2] The District Court sentenced Manigault to 84 months' imprisonment, three years of supervised release, and imposed a special assessment of $100.

Manigault appealed.[3]

## II

On appeal, Manigault argues that the District Court made four evidentiary errors during his trial.[4] First, he argues that the District Court erred when it denied his motion to

---

[1] Detective Kimmel had originally intended to download the video directly from the Homeowner's DVR onto a thumb drive but had technical problems doing so.

[2] At trial, all parties stipulated that Manigault had a prior felony conviction, which established that he had been convicted of a crime punishable by more than one year of imprisonment before the charged offense here.

[3] The District Court had subject matter jurisdiction under 18 U.S.C. § 3231 and we have jurisdiction over its final judgment under 28 U.S.C. § 1291.

[4] Manigault raises a fifth issue in his opening brief—whether the revolver and handgun were properly authenticated and admitted into evidence given a change in their description from the crime scene to the trial. He does not develop this argument further, so its mention is merely a "passing reference[.]" *Laborers' Intern. Union of N. Am., AFL-CIO v. Foster Wheeler Energy Corp.*, 26 F.3d 375, 398 (3d Cir. 1994) (internal quotation marks omitted) (quoted source and citations omitted). It is therefore forfeited. *Id.*

suppress based on his allegedly unlawful arrest and three-day detention. Second, Manigault argues that the District Court erred in denying his motion to suppress based on the allegation that the police destroyed evidence. Third, Manigault argues that the District Court erred in admitting the video recovered by Detective Kimmel from the homeowner because the video, he claims, was not sufficiently authenticated. Fourth, Manigault argues that the District Court erred when it denied his motion to compel production of a search warrant for the home whose owner provided the video to Detective Kimmel.

Manigault's suppression arguments fail because he lacked a legitimate expectation of privacy in both the evidence recovered and the areas where that evidence was found. Neither his allegation that the police destroyed evidence nor his argument that the video was not properly authenticated are supported by the record. Finally, his motion to compel fails because it seeks a search warrant that does not exist. We will therefore affirm the District Court's denial of these motions.

A

We review a "District Court's denial of a motion to suppress for clear error as to the underlying factual findings and exercise[] plenary review of the District Court's application of the law to those facts." *United States v. Perez*, 280 F.3d 318, 336 (3d Cir. 2002) (citation omitted). "We may affirm the rulings of the District Court for any proper reason that appears on the record[.]" *Id.* at 337 (citation omitted).

Manigault argues that the police lacked sufficient cause to stop him on the street corner and subsequently detain him for three days. This allegedly unlawful police conduct, he argues, requires suppression of the Taurus firearm Officer Olesik found in

6

the wheel well of the Ford automobile and the video Detective Kimmel retrieved from the homeowner as fruit of the poisonous tree.

Manigault's argument fails twice over. First, because neither the firearm nor the video was obtained because of his detention, any purported defect in that detention is not relevant for his suppression motion. Second, because Manigault did not have a reasonable expectation of privacy in either the handgun recovered or the homeowner's property, no Fourth Amendment violation occurred.

## 1

The fruit of the poisonous tree doctrine provides that evidence obtained as a result an officer's illegal conduct is not admissible in the defendant's criminal trial. *See, e.g.*, *Wong Sun v. United States*, 371 U.S. 471, 485 (1963) ("[t]he exclusionary rule has traditionally barred from trial physical, tangible materials obtained either during or as a direct result of an unlawful invasion"). Evidence that is obtained independently of an officer's illegal conduct, however, is not excluded. *Id.* at 487. In other words, there must be a connection between the evidence obtained and the illegal conduct; the mere fact that evidence was obtained after illegal conduct has occurred is not enough to trigger the exclusionary rule. *Id.* at 487–88 (explaining that the "question . . . is 'whether . . . the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint.' "(citation omitted)).

a

Here, we conclude for the same reasons set forth by the District Court that when Officer Olesik initially engaged Manigault and Austin, the three were engaged in a consensual encounter. *See United States v. Manigault*, 2020 WL 489495, at *6 (E.D. Pa. Jan. 30, 2020) ("Here, the initial encounter between Defendant and Austin and the police officers was consensual . . . [W]hen the police officers placed Defendant and Austin in the police cruiser after discovering a handgun in a nearby wheel well, this show of authority rose to the level of seizure."). The Terry stop did not begin until Officer Olesik placed them into his vehicle. There is no connection between Officer Olesik discovery of the Taurus handgun in the wheel well of a Ford and either Manigault's *Terry* stop or his subsequent three-day detention.[5] Recall that Officer Olesik uncovered the Taurus firearm in the wheel well of the Ford only after Officer Roher, moments earlier, located a gun in the wheel well of the Mazda. Indeed, it was during Officer Olesik's consensual encounter that Officer Roher's *lawful* discovery of the revolver in the wheel well of the Mazda that prompted Officer Roher and Olesik—correctly, as it turned out—to look for similarly disposed weapons in the area. Officers Roher and Olesik began by tracing the path from the stoop where they first spotted Manigault and Austin to the Katnip Bar where they found Manigault and Austin after circling the block. Quickly after beginning the search,

---

[5] In any event, the District Court concluded that Officers Roher and Olesik had reasonable suspicion to approach Manigault and Austin, and that the interrogation that followed was a consensual investigatory encounter. *See Manigault*, 2020 WL 489495, at *7 (E.D. Pa. Jan. 30, 2020) ("the brief detention was . . . based on the police officers' reasonable suspicion").

8

Officer Olesik discovered the Taurus firearm in wheel well of the Ford nearby the revolver that Officer Roher had discovered in the Mazda.

b

There is similarly no connection between the surveillance video located by Detective Kimmel on September 29 and Manigault's *Terry* stop initiated by Officers Roher and Olesik on the evening of September 27 (or his subsequent three-day detention). Not only was the surveillance video procured by a different Officer acting two days after Manigault was first stopped, but it was also obtained pursuant to the homeowner's voluntary actions.

In sum, a legal defect in Manigault's detention, even if one existed, did not render either the Taurus handgun or homeowner's surveillance video inadmissible.

2

Manigault's arguments also fail because he did not have a reasonable expectation of privacy in either the firearm that he discarded or in the private property of the homeowner from whom Detective Kimmel obtained the video evidence at issue. We explain each in turn.

a

First, Manigault cannot dispute the admissibility of the Taurus firearm because it is abandoned property. No Fourth Amendment "seizure" occurs where the government appropriates abandoned property. *Abel v. United States*, 362 U.S. 217, 241 (1960). Abandonment cases differ then from standing cases. *United States v. Wilson*, 472 F.2d 901, 902 (9th Cir. 1972) ("The *Abel* case does not teach that the defendant has no

standing to object to a search and seizure of abandoned property, but that there can be nothing unlawful in the government's appropriation of such abandoned property"). In standing cases, a Fourth Amendment violation has occurred, and the question is whether the defendant "has a legitimate expectation of privacy in the invaded place." *Minnesota v. Olson*, 495 U.S. 91, 95 (1990) (quoting *Rakas v. Illinois*, 439 U.S. 128, 143 (1978)). In abandonment cases, no Fourth Amendment violation has occurred. *Abel*, 362 U.S. at 241; *see also Texas v. Brown*, 460 U.S. 730, 748 (1983) (Stevens, J., concurring) ("[I]f an item has been abandoned, neither the Fourth Amendment interest [in retaining possession of property or maintaining personal privacy] is implicated, and neither probable cause nor a warrant is necessary to justify seizure.").

The question of fact that courts are left to determine is whether the property has been abandoned. *See United States v. Minker*, 312 F.2d 632, 634 (3d Cir. 1962). Abandonment of property must be shown by "clear and unequivocal evidence." *United States v. Moody*, 485 F.2d 531, 534 (3d Cir. 1973).

We have explained that "[a]bandonment for purposes of the Fourth Amendment differs from abandonment in property law." *United States v. Fulani*, 368 F.3d 351, 354 (3d Cir. 2004). Whether property is abandoned for Fourth Amendment purposes depends on "the individual's reasonable expectation of privacy, not his property interest in the item." *Id.* And whether an individual has a reasonable expectation of privacy is determined "from an objective viewpoint." *Id.* To that end, outward manifestations of an individual's intent to abandon property are important for deciding whether he abandoned

the property and had a reasonable expectation of privacy in that property. *See Moody*, 485 F.2d at 534.

The facts of *Abel v. United States*—the Supreme Court's seminal abandonment case—are instructive. 362 U.S. 217 (1960). There, federal officers arrested Rudolf Abel, who was suspected of espionage, in his hotel room. *Id.* at 223. Before removing Abel from the room, the officers let him collect his belongings. *Id.* at 224. He left two items behind in his hotel room's wastebasket: (1) "a hollow pencil containing microfilm" and (2) a "cipher pad." *Id.* at 225. On these facts, the Court concluded that Abel had abandoned them. *Id.* at 241.

Relying on *Abel*, we decided *United States v. Martin*, in which police gave chase to a fleeing suspect. 386 F.2d 213 (3d Cir. 1967) (per curiam). During the pursuit, the suspect discarded eight packets of narcotics into a hallway pantry. *Id.* at 214. After his arrest, the officers took the packets. *Id.* We held that "[d]efendant's voluntary act of throwing the packets into the pantry must be deemed an abandonment of his interest therein." *Id.* at 215.

More recently, in *Fulani*, we concluded that a defendant abandoned for Fourth Amendment purposes his luggage when he refused to acknowledge its ownership. 368 F.3d at 354–55. In that case, state narcotics officers boarded a Greyhound bus to investigate drug trafficking. *Id.* at 352. Asked directly by the officers if the defendant had any bags in the overhead rack, the defendant said no. *Id.* at 353. After questioning all passengers, the officers identified a suitcase stored overhead that no one had claimed. *Id.*

11

The officers asked whose bag it was, and no one responded. *Id*. Disclaiming ownership of the bag, we held, constituted abandonment for Fourth Amendment purposes. *Id.* at 354.

Manigault's disposal of his handgun into the wheel well of a parked vehicle constitutes abandonment. After making eye contact with Officers Roher and Olesik, Manigault understood that police were patrolling the area and, more importantly, the repercussions that would follow if he was caught with a firearm as a previously convicted felon. Under these circumstances, Manigault chose to discard his weapon it into the wheel well of a nearby vehicle.

Like the defendants in *Martin* and *Fulani*, he discarded his weapon to distance himself from incriminating evidence. Manigault placed his weapon on top of the wheel of an automobile in which he does not claim a property interest on a public street and then walked away. Under these circumstances, Manigault no longer maintained a reasonable expectation of privacy in the handgun and therefore abandoned it for Fourth Amendment purposes.

Because Manigault did not have a reasonable expectation of privacy in the abandoned handgun, his motion to suppress fails.

b

Second, Manigault lacks any reasonable expectation of privacy in the surveillance video provided by the homeowner. "What a person knowingly exposes to the public, even in his own home or office, is not a subject of Fourth Amendment protection." *Katz v. United States*, 389 U.S. 347, 349 (1967). The video was recorded by a third-party's surveillance system, in which Manigault had no privacy interest, and Manigault's actions

12

took place on a public street where he did not have a reasonable expectation of privacy. The District Court therefore did not err in admitting the homeowner's video evidence.

B

We review a district's court's findings of fact about an alleged violation of the government's constitutional disclosure obligations for clear error. *United States v. Pelullo*, 14 F.3d 881, 886 (3d Cir. 1994). We review its conclusions of law de novo. *Id.* But "[w]here the district court applies the correct legal standard, its 'weighing of the evidence merits deference[.]' " *United States v. Thornton*, 1 F.3d 149, 158 (3d Cir. 1993) (quoting *United States v. Pflaumer*, 774 F.2d 1224, 1230 (3d Cir. 1985)).

"We review the District Court's decisions as to the admissibility of evidence for abuse of discretion." *United States v. Serafini*, 233 F.3d 758, 768 n.14 (3d Cir. 2000) (citation omitted).

Manigault argues that the District Court erred by admitting the homeowner's surveillance video into evidence. He argues that the video was inadmissible because Detective Kimmel destroyed the original recording in bad faith. If true, copies would not be admissible under the Best-Evidence rule. Fed. R. Evid. 1004(a). Moreover, a bad-faith failure to preserve "potentially useful evidence" would violate Manigault's due process rights. *Arizona v. Youngblood*, 488 U.S. 51, 58 (1988).

But Manigault's allegations cannot be squared with the record. Nothing in the record suggests that Detective Kimmel deleted the recording he had downloaded onto his cellphone in bad faith. In fact, Detective Kimmel first downloaded the video onto his cellphone to preserve the video. Once he was back at the office, Detective Kimmel

transferred the video file to an external hard drive and to the department's file system. Only after these transfers did Detective Kimmel remove the file from his cellphone. Kimmel testified that he removed the file from his cellphone "to save space on [his] phone." Supp. App. at 593.

The District Court found no evidence contradicting Detective Kimmel's testimony or suggesting that he acted in bad faith. Instead, Officers Roher properly authenticated the video at trial by testifying that the video accurately reflected the events depicted on the homeowner's original recording. *See* Fed. R. Evid. 901(b)(1). And Manigault's own expert testified that none of the three video files he reviewed had been manipulated, edited, or clipped.

In sum, because no evidence suggests that Kimmel acted in bad faith when he removed the video file from his cellphone, the District Court neither ignored the Best-Evidence rule nor violated Manigault's due process rights when it admitted the homeowner's video at Manigault's trial.

C

We review the "District Court's decision regarding the authentication of evidence for abuse of discretion." *United States v. Browne*, 834 F.3d 403, 408 (3d Cir. 2016) (citation omitted).

The Federal Rules of Evidence explain that "[t]o satisfy the requirement of authenticating or identifying an item of evidence, the proponent must produce evidence sufficient to support a finding that the item is what the proponent claims it is." Fed. R. Evid. 901(a). This requirement is modest. "All that is required is a foundation from which

14

the fact-finder could legitimately infer that the evidence is what its proponent claims it to be." *In re Japanese Elec. Prods.*, 723 F.2d 238, 285 (3d Cir. 1983), *rev'd on other grounds sub nom. Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574 (1986). So "[t]he burden of proof for authentication is slight." *McQueeney v. Wilmington Tr. Co.*, 779 F.2d 916, 928 (3d Cir. 1985). Authenticity requires "only a prima facie showing[.]" *United States v. Goichman*, 547 F.2d 778, 784 (3d Cir. 1976). Once this prima facie showing has been made, any further dispute over authenticity is resolved by the jury. *Id.* Rule 901 provides examples of evidence that meet the authentication requirement. Relevant here, Rule 901 permits authentication with "[t]estimony that an item is what it is claimed to be." Fed. R. Evid. 901(b)(1).

The government met its initial burden by providing such testimony. Detective Kimmel testified in detail how he recovered the residential video. Officer Roher testified that the video depicted the events on the recording accurately.

Manigault presents two theories to undercut this testimony. First, he argues that there must be two videos obtained from the private residence because the video file's date and time stamp on the digital copy introduced into evidence differs from the date and time when Detective Kimmel testified he downloaded the file onto his cellphone. This discrepancy is easily explained. Each time the video was transferred a new timestamp was generated. Detective Kimmel downloaded the video file onto his cellphone one day, but then transferred the file to an external hard drive and the department's file system the next day. This discrepancy between time stamps, without more, is insufficient to conclude that

the District Court erred in determining that the homeowner's video is what Detective Killmer and Officer Roher claimed it to be.

Second, Manigault claims that another police detective executed a search warrant on the homeowner's address to obtain a copy of the residential video. His only evidentiary support is a stipulation by the government, for the preliminary hearing, that a search warrant had been obtained. But a stipulation for a preliminary hearing cannot change the authenticity of evidence provided at trial, particularly when that evidence is corroborated by extensive witness testimony and when the stipulation is later recanted. The District Court correctly concluded that the residential video had been properly authenticated.

D

Manigault last argues that the District Court erred by not ordering the government to disclose the search warrant Manigault claims it executed to obtain the residential video. This failure, Manigault argues, resulted in a *Brady* violation. *Brady v. Maryland*, 373 U.S. 83 (1963).

A districts court's findings of fact about an alleged violation of the government's constitutional disclosure obligations are reviewed for clear error. *Pelullo*, 14 F.3d at 886.

As discussed above, nothing in the record suggests the existence of a search warrant. According to Detective Kimmel's testimony, the homeowner's video was obtained with their consent, not pursuant to a search warrant. In fact, the District Court found zero

evidence that an undisclosed search warrant for the homeowner's property exists. Because there is no evidence that a search warrant exists, there is no *Brady* violation.

*   *   *

For these reasons, we will affirm.